**Dick JONES et al., Appellants,**

v.

**DISTRICT OF COLUMBIA REDEVELOP-MENT LAND AGENCY et al.**
**(three cases).**

**Nos. 73–1507, 73–1638 and 73–1754.**

United States Court of Appeals, District of Columbia Circuit.

Decided April 26, 1974.

Argued July 24, 1973.

---

504

Florence Wagman Roisman, Washington, D. C., for appellants.

Larry G. Gutterridge, Atty., Dept. of Justice, with whom Wallace H. Johnson, Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., Nathan Dodell, Asst. U. S. Atty., and Carl Strass, Atty. Dept. of Justice, were on the brief for federal appellees. No brief was filed on behalf of federal appellees in No. 73–1638.

Bernard S. Cohen, Alexandria, Va., on brief for Washington Ecology Center, amicus curiae.

Before BAZELON, Chief Judge, and ROBINSON and WILKEY, Circuit Judges.

BAZELON, Chief Judge:

In November, 1972, plaintiffs filed suit in the District Court challenging the legality of certain actions of the defendants—the District of Columbia Redevelopment Land Agency (RLA), the National Capital Planning Commission (NCPC), and the U. S. Department of Housing and Urban Development (HUD)—in formulating and executing plans for the urban renewal of the 14th Street area of the District.[1] Plaintiffs, residents of the area, applied to the Court for preliminary injunctive relief, asking the Court, *inter alia*, (1) to enjoin the defendants from taking any action pursuant to the Neighborhood Development Programs for the second, third and fourth "action years" until the defendant agencies had complied with the procedural requirements of the National Environmental Policy Act;[2] (2) to enjoin defendant RLA from displacing area residents without providing the benefits mandated by the Uniform Relocation Assistance and Real Property Acquisition Policies Act;[3] and (3) to enjoin defendant RLA from failing to maintain residential properties it has acquired in the area in accordance with the provisions of the District of Columbia Housing Code.

In a series of orders the District Court denied the requested preliminary injunctive relief in all respects save one, granting an injunction only as to further actions under the second and third-year Neighborhood Development Programs. This injunction, however, the Court stayed, and ultimately dissolved after defendant HUD had filed with the Court a final environmental impact statement concerning the programs. In response to this series of orders plaintiffs filed these appeals.

We reverse the District Court's orders only insofar as they rested on a determi-

---

1. This area, in the District's northwest quadrant, bounded on the south by Florida Avenue, on the north by Spring Road, and on the east and west by 11th and 16th streets respectively, was the scene of serious civil disturbances in April, 1968, following the death of Dr. King. As related in Part I, *in-*

*fra*, community and government efforts to reconstruct the area were begun shortly thereafter.

2. 42 U.S.C. § 4321 et seq.

3. 42 U.S.C. § 4601 et seq.

nation that the Uniform Relocation Assistance Act directs no mandate to defendant RLA. Although we have grave doubts concerning the District Court's handling of certain aspects of the NEPA issues in its initial order, we think these problems substantially resolved, and to some extent rendered moot, by the subsequent actions of the defendant agencies and the subsequent orders of the Court. We therefore find no cause to disturb the District Court's orders as to the remainder of the issues presented for our review.

## I.

An understanding of the issues before us requires a somewhat extensive account of the facts underlying this litigation and the complex course the litigation has thus far taken. In setting out upon the redevelopment of the 14th Street area, the District of Columbia chose to proceed under the Neighborhood Development Programs provisions of the federal Housing Act, [4] under which communities propose urban renewal activites to be undertaken in particular "action years," thus allowing HUD to fund, or decide not to fund, such activities in annual increments rather than years in advance of need. In the District, Neighborhood Development Programs (NDPs) for each action year must follow what the District Court termed "a tortuous route from conception to execution." After consultation with area residents and other interested parties, RLA formulates the action year program, the set of physical steps to be taken during the year in conformity with and in furtherance of an overall "workable program" for community development previously certified by HUD. RLA then submits its proposed action year program to NCPC for adoption or modification. If NCPC adopts the program, either as submitted or as modified, it is presented to the District's City Council, which holds public hearings on the program and decides whether to empower RLA to apply to HUD for federal funding. If the Council approves the program, NCPC certifies it to RLA for implementation the District applies to HUD for funding, and RLA proceeds to execute the provisions of the program. Thus, each action year program must, before execution, be passed upon by four distinct governmental bodies, three of which, RLA, NCPC and HUD, are federal agencies.

Renewal activities in the 14th Street area began in 1969 with the adoption of a general land use plan. By November, 1972, when this suit was instituted, NDPs 1, 2 and 3 had been fully approved in the manner described above; the fourth action year program, NDP 4, had been formulated by RLA, approved by NCPC, and forwarded to the City Council for its consideration. At the same time, pursuant to the action year programs already approved, RLA began to execute "Package I," preparing a prospectus to solicit bids and issuing notices to quit to residents of the site. It was apparently these actions of RLA that stimulated plaintiffs to bring this suit, plaintiffs objecting, in the main, to the ratio of low to moderate-income housing planned for Package I and in NDPs 2, 3 and 4 generally, and fearing that low-income residents of the area would be displaced despite the shortage of low-income housing elsewhere in the District.

On January 31, 1973, the District Court denied in all respects plaintiffs' motion for preliminary injunctive relief. Thereafter, perhaps in part in response to this suit, NCPC issued on February 16 an environmental impact statement concerning NDP 4, thus making it available shortly before City Council hearings were held on the plan. On March 7, the District Court vacated its order of January 31 and, in its stead, issued the first of the several orders before us on

---

4. 42 U.S.C. §§ 1469–1469c. These provisions were added to the Code by § 501 of the Housing and Urban Development Act of 1968, P.L. 90–448, 82 Stat. 518.

appeal.[5] In this order, the District Court held that, under Section 102(2)(C) of the National Environmental Policy Act (NEPA),[6] an environmental impact statement is required for each action year plan. Despite this holding, the Court refused to enjoin further action on NDP 4, finding that, because the plan had not yet been approved by the City Council nor funded by HUD, no irreparable harm to the environment was imminent. The Court did, however, enjoin further actions under NDPs 2 and 3, but stayed issuance of this injunction for sixty days "to afford the defendants the opportunity to complete and file formal environmental impact statements . . . . "[7] Finally, the Court refused to direct compliance with the Relocation Assistance Act and the District Housing Code, holding that the provisions of neither applied directly to defendant RLA.

Plaintiffs appealed from this order and, on May 7, filed emergency motions asking this Court (1) to vacate the stay of the preliminary injunction with respect to NDPs 2 and 3; (2) to reverse summarily the District Court's denial of a preliminary injunction with respect to NDP 4, the Uniform Relocation Assistance Act and the Housing Code; or, in the alternative, (3) to enter an injunction as to these matters pending disposition of the appeal. We denied these motions on June 8, the parties at that time agreeing to submit the case to the panel on the merits.

In the meantime, the following events had transpired: the District City Council approved NDP 4 on March 29, and the plan was submitted to HUD for funding; HUD issued a final environmental impact statement concerning the plan on May 25 and, in June, approved its funding. The plaintiffs thereupon applied once more to the District Court for a preliminary injunction, contending that, because the approval process had been completed, harm was now imminent. By order dated June 28, the Court again refused an injunction, on the ground that, since an appeal from its March 8 order was pending in this Court, it lacked jurisdiction over the NDP 4 question. On July 2, the District Court granted defendants' motion to dissolve the preliminary injunction with respect to NDPs 2 and 3, primarily because shortly before, HUD had issued and filed with the Court a final environmental impact statement concerning the plans. Plaintiffs filed appeals from both of these orders, and we consolidated these appeals with the earlier appeal for argument and decision.

## II

 Because these cases are before us on appeals from the denial and dissolution of preliminary injunctions,[8] matters that call, ordinarily, for the exercise of judicial discretion, the scope of our review is somewhat constricted. As we said recently in Maryland National Capital Park and Planning Commission v. U. S. Postal Service, "[t]his court ordinarily will not disturb the order of the District Court except for abuse of discretion or clear error, . . . and we do not consider the merits of the case further than necessary to determine whether that discretion was abused. . . ."[9] With this general standard of review in mind, we turn first to plaintiffs' claims under the Uniform Relocation Assistance Act and the District Housing Code, neither of which, we think, requires any very extended discussion.

 In declining to enjoin RLA from "allowing or effecting the displacement of any resident of the 14th Street

---

5. Jones, et al. v. D.C. Redevelopment Land Agency et al., C.A. 2258–72, 5 ERC 1139 (D. D.C. March 7, 1972), hereinafter referred to as March 7 Order.

6. 42 U.S.C. § 4332(2)(C).

7. 5 ERC at 1142–43. This stay was subsequently extended to June 15 and then to June 22.

8. 28 U.S.C. § 1292(a)(1).

9. 159 U.S.App.D.C. 158, 487 F.2d 1029, 1035 (1973) (citations omitted).

**508**

NDP area for whom relocation housing and other benefits have not been provided as required by the [Uniform Relocation Assistance] Act," the District Court held that the Act's requirements are directly imposed only on federal agencies and, in particular, HUD; and that, by express provision of the Act, RLA is deemed a state rather than a federal agency.[10] We think the District Court's construction of the Act was correct. We do not agree, however, that this construction in any way precludes the grant of preliminary relief against defendant RLA.

Section 210 of the Act[11] provides that " * * * the head of a federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person * * * unless he receives satisfactory assurances" that the state agency will provide relocation assistance equivalent to that required of federal agencies.[12] Thus, it is true, as the District Court held, that the legal duty created by Section 210 falls on the "head of a federal agency," in this case the Secretary of HUD, rather than on state agencies directly. But it is equally clear, we think, that to receive federal aid, state agencies—including RLA—must give assurances that relocation assistance will be made available and, in accepting federal aid, they incur an obligation to carry such assurances out.

■■ Here, plaintiffs contend that, in fact, RLA has not provided the assurances required by Section 210 and by HUD regulations,[13] that, nonetheless,

the defendant HUD has continued to fund the 14th Street project and that, in consequence, residents are being displaced without the relocation assistance that Section 210 mandates.[14] There is no question that the Secretary's duty under Section 210 is, in proper circumstances, subject to judicial enforcement. If, however, the Secretary fails in that duty, and if, therefore, federal funds have already been distributed, a preliminary injunction directed against the state agency, rather than the Secretary, may be the only means available to ensure that the funds are not used to displace area residents without provision of the assistance that Congress clearly intended them to have.[15]

Defendant agencies argue on this appeal, as they did below, that contrary to plaintiffs' representations, RLA is now in full compliance with Section 210. This is, of course, a matter for the District Court to resolve. In reversing the Court's order on this point, we hold only that if, on remand, the Court finds that plaintiffs' representations are correct, there is no statutory bar to a preliminary injunction against defendant RLA, if the Court thinks such an injunction necessary to achieve the purposes of the Act.

■ In its March 7 order, the District Court also refused to enjoin RLA "from maintaining any of its residential properties in the 14th Street NDP area otherwise than in compliance with the D.C. Housing Code."[16] In doing so, the Court relied on the principle of statutory construction that "a general statute imposing restrictions does not impose them on the Government itself, without a clear expression or implication to that

10. 42 U.S.C. § 4601.

11. 42 U.S.C. § 4630.

12. 42 U.S.C. § 4625.

13. 24 C.F.R. Parts 41 and 42 (April 1, 1973).

14. Plaintiffs' Points and Authorities in Support of Motion for Preliminary Injunction, at 2.

15. *E. g.*, Lathan v. Volpe, 455 F.2d 1111, 1119–1120 (9th Cir. 1971); LaRaza Unida v. Volpe, 337 F.Supp. 221, 233–234 (N.D.Cal. 1971); Western Addition Community Org. v. Weaver, 294 F.Supp. 433, 440–441 (N.D. Cal.1968).

16. 5 ERC at 1140.

effect. . . ."[17] The Court found no implication in the statute delegating to the District Government the power to "[m]ake and enforce building regulations"[18] that Congress intended such regulations to apply to buildings acquired by defendant RLA. RLA is not authorized to operate the properties it acquires as permanent residences; instead, its authority extends only to the acquisition of blighted properties, and these, eventually, must either be demolished for redevelopment or completely rehabilitated. Hence, RLA maintains its properties as residences only temporarily, until relocation housing for residents becomes available and redevelopment or rehabilitation can be undertaken. Given the nature of RLA's functions, we agree with the District Court that it would be unreasonable to construe the Housing Code as immediately and directly applicable to FLA's temporary residential properties.

In any event, plaintiffs appear on this appeal to have abandoned their original position. They now contend that although RLA may not be bound to abide the detailed regulations of the Code, it is required to maintain its residential property in a decent, safe and sanitary condition.[19] We do not see, however, how the District Court's order can in any way be taken to reject this contention. On the contrary, the Court stated that, in denying preliminary relief, it did not mean to say "that the require-ment that the housing be 'decent, safe and sanitary' is in any way softened but only that the standard need not be synonymous with the often technical long-term requirement of a housing code."[20] Moreover, RLA has fully acknowledged that it is obliged to comply with the "decent, safe and sanitary" standard.[21] In short, both parties seem now to agree on the applicable standard, and the dispute between them has apparently reduced to a matter, essentially, of fact: whether RLA is now in compliance. And this, of course, is a question for the District Court to resolve, after full presentation of the evidence and the illumination of trial.[22]

### III

■ A. We turn, then, to the NEPA issues presented in these appeals and, more particularly, to the questions whether the District Court erred in (1) denying a preliminary injunction, on NEPA grounds, as to NDP 4, and (2) in staying and ultimately dissolving the preliminary injunction it granted as to NDPs 2 and 3. As we noted above, the grant or denial of preliminary relief is a matter that calls for the exercise of judicial discretion. At the same time, however, "[n]ot only the avowed forecast as to probability of success on the merits, but also the analysis of injury to either or both parties, the public interest, and the balancing of interests may . . . depend on an assumption of

---

17. United States v. Wittek, 337 U.S. 346, 359, 69 S.Ct. 1108, 1115, 93 L.Ed. 1406 (1949).

18. 1 D.C.Code § 228.

19. Appellants' Motion to Vacate Stay, for Summary Reversal, or, in the Alternative, for an Injunction Pending Appeal, at 20–21.

20. 5 ERC at 1144.

21. E. g., Appellees' Supplement to Memorandum in Opposition to Motion to Vacate Stay, for Summary Reversal or in the Alternative, for an Injunction Pending Appeal, at 29–30.

22. The District Court's approach here in no way conflicts with that of this Court in Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045 (1970). There, of course, the Court dealt with *permanent* public housing; and even with respect to such housing, the Court said that whether the Housing Code should be held applicable in full force or should be employed as a point of reference in elaborating the "decent, safe and sanitary" standard could be determined only after trial on the merits. Here, by the same token, we think that the housing regulations can and should be employed as a starting point in determining the precise content of the standard with which RLA must comply, with practical adjustments made in response to the purposes of RLA and the nature of its functions.

underlying legal premise." [23] Were we confronted in this case with the District Court's March 7 order alone, we would have substantial doubts that the Court had correctly identified the legal premises on which exercise of its discretion necessarily depended and, consequently, we might have found it appropriate to remand for further consideration. [24]

The now familiar provisions of Section 102(2)(C) of NEPA require that "to the fullest extent possible" all federal agencies must include a detailed environmental impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment . . . ;" this environmental impact statement is to "accompany the proposal through the existing agency review processes. . . ." [25] In its March 7 order, the District Court held, and the defendants do not here contest, that "a NEPA statement for each NDP is required." [26] The Court failed, however, to provide any indication as to when, in the complex NDP approval process, NEPA statements must be prepared. It is this question, and its relevance to the propriety of granting or denying injunctive relief, that has become the focus of contention on this appeal.

■ The federal defendants argue that they must be allowed discretion in determining the points in the NDP approval process at which NEPA statements can most effectively and profitably be prepared. They say they have reasonably concluded that the requirements of NEPA can best be fulfilled by having NCPC prepare a draft statement concerning each action year program; this draft would be submitted, together with the program proposal, to the City Council and, if the Council approves, to HUD; and HUD would then prepare and issue a final environmental impact statement. We think this application of NEPA to the NDP approval process reasonable as far as it goes. But we find it deficient in one important respect: it makes no provision for RLA to prepare a draft impact statement for submission to NCPC.

■ Although we have said that it is, in the first instance, the responsibility of the agencies to mesh NEPA's requirements with their decision-making processes, [27] we have emphasized, at the same time, "that an agency's duties to issue a statement on a project and to consider environmental factors at each stage of agency decision-making . . . are not inherently flexible or discretionary." [28] The great majority of cases concerning the timing of impact statements have dealt with the process of decision-making within a single agency. But we think the principles they have formulated entirely applicable to the situation here, where decision-making is accomplished by three federal agencies—RLA, NCPC and HUD—acting *seriatim*. As noted above, RLA submits a fully formulated NDP to NCPC for its consideration. We think it clear that RLA's submission is a "distinctive and comprehensive stage of the . . . process," [29] i. e. that it is itself a proposal for federal action requiring an environmental impact statement.

■ The federal defendants argue, however, that to require RLA to submit

**23.** Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 832 (1972).

**24.** *Id.*

**25.** 42 U.S.C. § 4332(2)(C).

**26.** 5 ERC at 1142.

**27.** *See* Scientists' Institute for Public Information, Inc. v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092 (1973); Citizens Ass'n.

of Georgetown, Inc. v. Zoning Comm'n. of D.C., 155 U.S.App.D.C. 233, 477 F.2d 402, 408 (1973).

**28.** Scientists' Institute for Public Information, Inc. v. AEC, *supra* note 27, 481 F.2d at 1091. *See* Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118 (1971).

**29.** Greene County Planning Board v. FPC, 455 F.2d 412, 420 (2d Cir. 1972).

an environmental impact statement to NCPC together with its action year plan would be inefficient, since NCPC may well modify the plan and thus render RLA's impact statement an anachronism. But, in our view, this argument proves too much. Indeed, it radically misconceives the purposes of the impact statement requirement. Such statements were not to be merely *post hoc* environmental rationalizations of decisions already fully and finally made. Rather their purpose is to ensure "meaningful consideration of environmental factors at all stages of agency decision making," and to inform both the public and agencies implicated at subsequent stages of decision-making of the environmental costs of the proposal.[30] Thus, it is precisely because NCPC has the power to modify RLA's action year proposals that impact statements accompanying the proposals are necessary. NCPC's decisions on whether to approve the proposals as presented or to modify them may be, and should be, vitally affected by the information contained and the conclusions drawn in RLA's impact statements. Equally important, perhaps, the public will be afforded an opportunity, prior to NCPC's decision, to inform it of data and views contrary to those submitted by RLA, thus ensuring that NCPC's decision and NCPC's own environmental impact statement will be premised on the fullest possible canvassing of environmental issues, and that environmental factors will be taken into account *before* the action year plans take on the perhaps irreversible momentum of NCPC approval.[31]

B. We hold, therefore, that to meet the requirements of NEPA, both RLA and NCPC must include impact statements in their proposed action year programs, and that HUD must prepare and issue final statements when the programs are finally approved. This was not, of course, the procedure that the defendant agencies followed here. As of March 7, when the District Court issued its original order, NCPC had, as we have noted above, issued a draft statement concerning NDP 4; no statement had previously been issued by RLA. In denying an injunction as to NDP 4, the District Court said that " 'federal action . . . significantly affecting the quality of the human environment' has not yet taken place nor is it imminent."[32] On its face, this appears to be a conclusion that none of the federal agencies had, as of March 7, a matured obligation under NEPA. Such a conclusion, in light of what we have said above, would be clearly erroneous.

But this is not, apparently, what the District Court had in mind. Instead the Court seems to have been referring to the absence of imminent, irreparable harm flowing from the defendants' failure to comply with NEPA. NDP 4 was, according to the Court, only in the preparatory stage; no final decision concerning it had been reached. The Court continued: "Preparatory activities alone do not have the effect of triggering rights to preliminary injunctive relief for governmental failure to comply with NEPA. Only affirmative action that is likely to have direct tangible consequences of an environmental character . . . will do this; i. e., the commitment of resources or the entry into an enforceable obligation to commit resources in such a way as to ensure environmental consequences."[33] In short, unless defendant agencies were about to take, or were taking, physical steps to carry out the action year program, a preliminary injunction requiring compliance with NEPA could not issue.

---

30. Scientists' Institute for Public Information, Inc. v. AEC, *supra* note 27, 481 F.2d at 1091. *See* Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra* note 28, 449 F.2d at 1114.

31. *See* Lathan v. Volpe, *supra* note 15, 455 F.2d at 1121 (9th Cir. 1971).

32. 5 ERC at 1142.

33. *Id.*

We think that the District Court defined too narrowly the kind of harm that, under NEPA, may be sufficient to warrant the intervention of a court of equity, even at a preliminary stage. The harm against which NEPA's impact statement requirement was directed was not solely or even primarily adverse consequences to the environment; such consequences may ensue despite the fullest compliance. Rather NEPA was intended to ensure that decisions about federal actions would be made only after responsible decision-makers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs.[34] Thus, the harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates. And, for purposes of deciding whether equitable relief is appropriate, we think that this harm matures simultaneously with NEPA's requirements, i. e., at the time the agency is, under NEPA, obliged to file the impact statement and fails to do so.[35]

We do not mean to say, however, that, because RLA had failed to file an impact statement with its NDP 4 proposal, the District Court was compelled to issue a preliminary injunction requiring it to do so. As we explain more fully below, the District Court may conclude that a declaration of the agencies' NEPA obligations is sufficient to ensure compliance, especially if the agencies promise remedial action before actual, physical steps are contemplated. Moreover, when the deficiency concerns matters of timing, the required remedial actions need not necessarily be the equivalent of strict compliance. Adjustments in light of the circumstances may be made to the extent that the public interest demands. We hold only that, under NEPA, the imminence of physical steps is not an indispensable condition to preliminary injunctive relief.

Our second area of doubt concerning the District Court's March 7 order centers on the Court's treatment of plaintiffs' motion for preliminary relief as to NDPs 2 and 3. Because these programs had been fully approved and action pursuant to them was about to be undertaken, the Court said that "the prospect of imminent action promising significant environmental consequences" required "preliminary injunctive relief barring the RLA from completing this implementation until corrective action is taken."[36] Although it granted the preliminary injunction, however, the Court found it appropriate to stay the injunction's effect for sixty days to allow the defendants to prepare and file impact statements, It did so because of its view that it would "be disastrous . . . to forthwith halt all activity in the 14th Street area . . . only to find that a NEPA statement, when submitted, points to no substantial change in goals or methods."[37] We think this approach unsound. The purpose of equitable intervention in cases in which federal agencies have failed to comply with NEPA's requirements is to ensure that such compliance will take place before there has been an "irretrievable commitment of resources."[38] It may be that preparation of the statement will, in the end, not move the agency from adherence to decisions it has already made. But it is not for the courts to prejudge. So long as the *status quo* is

---

34. *See* Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra* note 28, 449 F.2d at 1115.

35. *See* Lathan v. Volpe, *supra* note 15, 455 F.2d at 1116–1117.

36. 5 ERC at 1142.

37. *Id.*

38. *See, e. g.*, Lathan v. Volpe, *supra* note 15, 455 F.2d at 1020–1021.

maintained, so long as the environmental impact statement is not merely a justification for a *fait accompli*, there is a possibility that the statement will lead the agency to change its plans in ways of benefit to the environment.[39] It is this possibility that the courts should seek to preserve.[40]

■ This is not to say, of course, that the District Court erred in taking into account the public interest militating against even a temporary halt in the program. We think, however, that rather than stay the effect of its injunction as to the program in its entirety, the ·Court should have followed the approach taken by the First Circuit in Jones v. ·Lynn, a case closely similar to this. In short, we think that the court should have engaged in a more particularized analysis, staying the injunction only as to those elements of the project delay of which would demonstrably result in injustice or substantial public harm.[41]

C. Despite our doubts about the premises of the District Court's March 7 order, we do not find a remand appropriate. Final environmental impact statements have been filed, in May as to NDP 4, and in June as to NDPs 2 and 3. On June 28, the District Court again refused to enjoin actions under NDP 4. Although it did so on jurisdictional grounds, the Court went on to say that the actions of NCPC and HUD, in issuing, respectively, draft and final statements on the plan, had achieved the substance of compliance with NEPA. On July 2, the Court dissolved the preliminary injunction as to NDPs 2 and ·3,

finding that the "corrective measures [defendants] have taken . . . have led to a belated but obviously thorough examination of environmental factors and have gone far to correct any damage which may have arisen from [the earlier] violation, i. e., the unwitting creation of an adverse environmental impact."

■ The Court's June 28 and July 2 orders were in no way based on a misconception that the defendants' remedial actions were the equivalent of strict compliance with NEPA's requirements. On the contrary, the Court acknowledged that, as we have held above, "[p]referred practice would be for a draft impact statement to accompany each NDP from its inception." Thus, as this litigation has evolved, the primary question now confronting us is whether the District Court abused its discretion in deciding that something less than strict compliance with NEPA was sufficient to avoid a preliminary injunction against further actions under the NDPs. ·

In most cases, perhaps, it is possible and reasonable for the courts to insist on strict compliance with NEPA, and actions can, consistently with the public interest, be enjoined until such compliance is forthcoming.[42] But we think the District Court had strong reason to conclude that this was not the case here. The action-year programs, as the District Court found, are bound by exigencies of time and funding; unless they are carried out within a reasonable time, it may prove impossible to carry them out at all. Delay may prove fatal. Moreover, insofar as they apply to the 14th Street area, the programs are, the

---

39. *See, e. g.,* Jones v. Lynn, 477 F.2d 885, 891–892 (1st Cir. 1973) ; City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972).

40. There was no question here, of course, that an environmental impact statement was required. Hence, this case is fundamentally unlike our recent decision in Arizona Public Service Co. v. F.P.C., 157 U.S.App.D.C. 273, 483 F.2d 1275 (1973), in which we gave the

FPC ninety days to conduct whatever further proceedings it deemed necessary to prepare either an impact statement or a statement as to why no impact statement was necessary. .

41. 477 F.2d at 892–893. .

42. *See* F. Anderson, NEPA in the Courts 49–55 (1973).

**514**

Court found, a vitally needed effort to renew a particularly blighted area of the District.

Of course, these factors in no way excuse the defendants' failure, in the first instance, to comply with NEPA. But they may, we think, properly be taken into account by a court of equity in deciding whether and what sort of relief is appropriate. Here, the Court concluded that, in order to preserve the efficacy of the programs, it was necessary to allow the defendant agencies to telescope their compliance with NEPA. In doing so., however, the Court was convinced that the defendants' remedial actions achieved the substance of NEPA's requirements and purposes. Moreover, plaintiffs do not contend, at this point at least, that the impact statements as finally issued are deficient in comprehensiveness. Their objection goes solely to the statements' timing. We deem it important to recognize that, once decisions have been made, it may, as a practical matter, be impossible to duplicate the kind of staged infusion of environmental information and consideration that NEPA contemplates.

The District Court found, in short, that requiring the defendant agencies to repeat the complex NDP approval process in a manner that comports fully with NEPA would not, in all probability, better serve NEPA's purposes than the remedial actions already taken, and that any such requirement would be distinctly contrary to the public interest. It is enough to say that, in the particular circumstances of this case, we find no abuse of discretion in this decision.

Accordingly, we affirm the District Court's orders except with respect to the denial of relief under the Uniform Relocation Assistance Act. On that point we reverse and remand to the District Court for further consideration.

So ordered.