**GIFFORD–HILL & COMPANY, INC.**
**v.**
**FEDERAL TRADE COMMISSION et al.**
**Civ. A. No. 74–1265.**

United States District Court,
District of Columbia.
Nov. 13, 1974.

———◆———

Peter J. Nickles, Washington, D. C., for plaintiff.

Robert Werdig, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

I. *The Claim.*

This matter is before the Court on plaintiff's motion for a preliminary injunction prohibiting certain adjudicatory proceedings before an administrative law judge of the Federal Trade Commission (FTC).[1] The plaintiff contends that such antitrust enforcement policy and procedures are subject to the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970) ("NEPA").[2]

The complaint is in four counts. Count I states that NEPA requires all agencies of the Federal Government to develop methods and procedures whereby

---

1. The FTC believes that certain acquisitions of other companies by plaintiff are in violation both of the Clayton Act (15 U.S.C. § 18 (1970)) and of the Federal Trade Commission Act (15 U.S.C. § 45 (1970)). Administrative Complaint, In the Matter of Gifford Hill & Co., Inc., Docket No. 8989, before the Federal Trade Commission.

2. In particular plaintiff complains of agency activity in regard to the FTC's "Enforcement Policy With Respect To Vertical Mergers In the Cement Industry," released January 17, 1967, as set forth at Trade Reg. Rep. ¶ 4520 at 6901.

environmental factors may receive appropriate consideration in decisionmaking.[3] Plaintiff asserts that the FTC has specifically exempted its own law-enforcement adjudication proceedings from NEPA.[4] Plaintiff claims that this is contrary to the requirements of NEPA since the Act requires the FTC to create procedures by which adjudicatory proceedings requiring an impact statement may be identified.

Count II recites the FTC's alleged duty, under NEPA, to consider and weigh adequately environmental concerns with respect to the continuing implementation of programs formulated before the passage of NEPA. In particular, plaintiff complains of the FTC's continuing implementation of the Cement Guidelines and the initiation and prosecution of the proceeding at issue in FTC Docket No. 8989.

Count III states that the FTC has violated NEPA in that it has not filed an environmental impact statement ("EIS") with respect to continuing implementation of the Cement Guidelines.[5] In Count IV, the plaintiff alleges that the particular adjudicatory proceeding with which it is faced is a major Federal action which requires the filing of an EIS.

On the motion for preliminary injunction, plaintiff requests that the FTC be enjoined from: 1) Taking any action implementing the Cement Guidelines, including prosecution of the administrative action involving plaintiff (FTC Docket No. 8989), unless and until the FTC has established procedures conforming to NEPA with respect to continuing implementation of its enforcement program, has considered environmental issues in connection with implementation of the Guidelines and has filed an EIS with respect to implementation of the Guidelines; 2) Taking any action prosecuting FTC Docket No. 8989 unless and until the FTC has established appropriate NEPA procedures in regard to its adjudicatory proceedings, has properly considered environmental issues in relation to prosecution of FTC Docket No. 8989 and has filed an EIS with regard to such prosecution.

II. *Parties.*

Plaintiff herein is Gifford-Hill and Company, Inc. ("GFH"), a corporation which has its principal place of business in Dallas, Texas. GFH and its subsidiaries are primarily engaged in the production and sale of certain construction materials, including ready-mixed concrete, aggregates, portland cement, concrete sewer and water pipe and other concrete products. Defendant Federal Trade Commission (FTC) is an agency of the Federal Government which administers several statutes regulating competitive and commercial practices. The named individual defendants are commissioners of the FTC.

III. *Facts.*

This suit found its genesis in the FTC's decision of May, 1974, to challenge GFH's acquisition of certain companies. These acquisitions had taken place in 1967, 1970, and 1972 and included companies engaged in the manufacture of concrete products and

3. 42 U.S.C. § 4332(A), (B) (1970).

4. 16 C.F.R. § 1.83(d). The Regulations specifically exempt:
   Any investigation made . . . for law enforcement purposes; any process or order issued . . . in connection with any type of investigation; any agreement of voluntary compliance or consent decree entered into by the Commission; or any adjudicatory proceedings commenced by the Commission.
   *Id.*
   The exemption specified is solely from the requirements of 42 U.S.C. § 4332(2)(C)

(1970), requiring impact statements to be filed for "major Federal actions significantly affecting the quality of the human environment." *Id.* Other FTC functions are of course under NEPA. *See* 16 C.F.R. § 1.81 et seq.

5. Plaintiff believes that an EIS is required pursuant to the command of 42 U.S.C. § 4332(2)(C) (1970). Plaintiff, of course, thinks that continuing implementation of the Cement Guidelines is major Federal action having a significant effect on the quality of the human environment.

ready-mixed concrete and in the mining of aggregates.[6] The FTC was of the opinion that these mergers violated anti-trust provisions of United States law.[7] The FTC apparently took this view because it had determined that the mergers in question were inappropriate under its guidelines respecting vertical mergers in the cement industry.[8]

The FTC advised GFH of its decision and invited attention to the possibility of settlement by a consent order procedure. Negotiations, however, were unsuccessful.[9] The main disagreement between the parties appears to have been the suggested divestiture by GFH of one of its acquisitions, Becker Sand & Gravel Co. and a ten year prohibition on acquisitions of similar firms. Becker Sand & Gravel (Becker) is a producer of mineral aggregates, including sand and gravel, and is based in North and South Carolina. Becker produces its sand and gravel by means of strip-mining operations.[9a] At some point in the negotiations, plaintiff suggested that NEPA was applicable to the FTC's adjudicatory proceedings.

Negotiations had reached an impasse and were terminated. The FTC issued an administrative complaint on August 7, 1974. This law suit was filed on August 21, 1974.

### IV. Conclusions of Law.

#### A. Standards for a Preliminary Injunction.

■ The considerations governing issuance of a preliminary injunction are as follows: 1) whether the movant has shown a substantial probability of prevailing on the merits; 2) whether movant has shown that irreparable harm will follow if the injunction does not issue; 3) whether issuance of a preliminary injunction substantially harms other parties to the proceedings and 4) where lies the public interest. Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958). These criteria bind the Court in the present case.

#### B. Application of NEPA.

The sections of NEPA which purportedly govern this case,[10] require that all

---

6. "Construction aggregates" are sand, and gravel or crushed stone which constitute the ingredients (with cement) of concrete products such as ready-mixed concrete.

7. 15 U.S.C. §§ 18, 45 (1970).

8. Enforcement Policy With Respect To Vertical Mergers In the Cement Industry, released Jan. 17, 1967, *as set forth at* 1 Trade Reg.Rep. ¶ 4520 at 6901 [hereinafter cited as Cement Guidelines].

9. The FTC's contemplated complaint had suggested divestiture by GFH of the various companies concerned and a ten year ban on similar acquisitions. This contemplated relief was eventually requested in the formal administrative complaint. Complaint in the matter of Gifford-Hill & Co., Inc., No. 8989 before the Federal Trade Commission at 8. GFH apparently rejected such relief, at least insofar as it would have applied to its acquisition of Becker Sand & Gravel Co., a mineral aggregates company. *See* Plaintiff's Complaint at 5; Memorandum In Support of Plaintiff's Motion for Preliminary Injunction at 4.

9a. Memorandum In Support of Plaintiff's Motion for Preliminary Injunction at 5; Affidavit of J. P. Phillips, Jr., at 2.

10. 42 U.S.C. § 4332(2)(A), (B), (C) (1970). The statute reads as follows:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and

agencies, to the fullest extent possible, develop methods and procedures which will permit unquantified environmental values to be considered in agency decisionmaking.[11] It also requires the preparation of an EIS in connection with every recommendation or report on legislative proposals and other major Federal action significantly affecting the environment.[12] The Court is also aware of the general policy statement which the Congress has made with regard to NEPA.[13]

(1) *Probability of Prevailing on the Merits.*

The issue in this case is twofold. First, the Court must determine whether the FTC need weigh environmental factors in deciding whether to initiate an adjudicatory proceeding which has as its purpose the enforcement of United States antitrust or fair competition law. Second, assuming the answer to the first question to be affirmative, the Court must decide whether the FTC must file an EIS before proceeding with

other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action.

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; . . . . .

11. 42 U.S.C. § 4332(2)(A), (B) (1970).

12. *Id.* § 4332(2)(C).

13. Id. § 4331. The policy statement reads as follows:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expand-

ing technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

its adjudicatory action.[14] The second aspect of the case obviously depends for its resolution upon the determination of the first aspect. The key question, then, is whether the FTC must weigh and consider environmental factors in determining whether to commence an administrative law-enforcement proceeding.

NEPA has, of course, generated much litigation. Paradoxically, however, there is a paucity of cases in point. The Court has been cited to no case that involved the application to NEPA to what was a law-enforcement adjudicatory proceeding. The Court's own researches have failed to disclose such a case. It thus appears that this is a case of first impression in the Federal system. Accordingly, the Court turns first to the legislative history of the statute to determine if the Congressional intent is clear.

The House Report[15] is not helpful since it addresses itself almost entirely to the need for a Council on Environmental Quality and the appropriate methods of operation for such a Council. The Senate Report,[16] however, contains a discussion of other provisions of NEPA. After a study of that Report, however, the Court has concluded that, while helpful, the Report provides no authoritative answer to the question at issue here.[17]

The Senate Report states that the purpose of the Act is to establish

a national policy to guide Federal activities which are involved with or related to the management of the environment or which have an impact on the quality of the environment.[18]

The Report then goes on to state the rising concern regarding the environment. By way of examples of Federal contribution to environmental degradation, it recites such things as the loss of publicly-owned beaches and open spaces to industry and commercial users, the proliferation of pesticides, the impact of airport development, water pollution and the impact of public construction projects.[19] Subsequently, in its analysis of the provisions of NEPA (then S. 1075), the Report stated:

All agencies which undertake activities relating to environmental values, particularly those values relating to amenities and aesthetic considerations, are authorized and directed to make efforts to develop methods and procedures to incorporate those values in official planning and decisionmaking.[20]

The Report, then, does give some idea of the sort of activities at which the Act is aimed.[21] It is unfortunately silent regarding NEPA applicability to the situation now before the Court.

■ Since the legislative history is devoid of authoritative guidance, the Court must look to case law to ascertain whether reported decisions of the courts have been sufficiently analogous to the present situation to be persuasive here. We begin this inquiry with the knowledge that NEPA has not amended or repealed any other Federal statute.[22] It follows that the policies of the Clayton

14. These determinations must be made within the present procedural posture of the case, i.e., a motion for preliminary injunction. Any conclusions expressed by the Court are thus of necessity tentative rather than final.

15. H.R.Rep.No. 91–378, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News, p. 2751.

16. S.Rep.No. 91–296, 91st Cong., 1st Sess. (1969).

17. The Court notes, however, that the Report is of aid in reaching final conclusions regarding the Congressional intent.

18. S.Rep.No. 91–296, supra note 17, at 8.

19. Id.

20. Id. at 20.

21. From the legislative material quoted, it would appear that NEPA was aimed at activities of Federal agencies which have a direct impact on the environment or which are substantially related to other activities which will so impact.

22. 42 U.S.C. §§ 4334, 4335 (1970). See United States v. S.C.R.A.P., 412 U.S. 669, 694, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Act and the Federal Trade Commission Act are still in force and effect.

As the Court has stated, it finds no case directly in point. Plaintiff, however, seeks to convince the Court of the correctness of its views by reliance upon a number of cases which it claims are analogous. The Court will briefly discuss these cases.

First among them is Calvert Cliffs' Coordinating Comm., Inc. v. A.E.C., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). There the Court dealt with AEC rules governing construction permits for power plants and the licensing of operations.[23] The Court rejected the AEC position that NEPA should be excluded from application to hearings reviewing licensing requests. The Court also required that NEPA be applied to prior continuing projects.[24] *Calvert Cliffs,* then, dealt with Government permission to build and operate major power plants. This is vastly different from the situation at bar.[25]

In Sierra Club v. Froehlke, 486 F.2d 946 (7th Cir. 1973), the Court considered whether an EIS filed by the Corps of Engineers was sufficient to comply with NEPA. The EIS related to the construction of a dam authorized by Congress. The procedure in question was thus a Federal construction project obviously and intimately bound up with the environment. The situation in *Froehlke* is thus distinquishable from the case at bar. The same may be said of *Hanly I,*[26] *Hanly II,*[27] and both cases entitled Environmental Defense Fund, Inc. v. Corps of Engineers.[28]

Plaintiff also relies on language in Jones v. D. C. Redevelopment Land Agency, 162 U.S.App.D.C. 366, 499 F.2d 502 (1974). There the Court said:

> [T]he harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates.[29]

In *Jones* the Court was considering the requirements of NEPA in regard to urban renewal plans for the 14th Street area of the District of Columbia. In the Court of Appeals, however, the defendants did not contest the proposition that NEPA did apply to the Agency's activities.[30] The only question at issue before the Court was that of the appropriate time for filing the required EIS and by whom such statements should be prepared.[31] *Jones,* then, is another case in which Federal action would have a direct and apparent impact on the environment and which was obviously within the scope of NEPA.

The case of Harlem Valley Transportation Assoc. v. Stafford[32] is also distin-

---

23. 146 U.S.App.D.C. at 40–41, 449 F.2d at 1116–1117.

24. The FTC has recognized its duty in this regard. *See* 16 C.F.R. § 1.85.

25. Similar to *Calvert Cliffs* and also vastly different from the case at bar is Greene County Planning Bd. v. F.P.C., 455 F.2d 412 (2d Cir.), cert.' denied 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). *Greene County* dealt with an FPC licensing procedure in which the Power Authority of the State of New York sought FPC permission for the construction of a high-voltage power transmission line. *Id.* at 415. The court there was concerned with the question of whether the FPC could adopt an EIS prepared by the New York state agency rather than preparing its own EIS.

26. Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972). The case dealt with the building of an office complex, with jail, by the Justice Department.

27. Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972). The same jail was at issue as was at issue in *Hanly I.*

28. The two cases are to be found at 470 F. 2d 289 (8th Cir. 1972) and at 492 F.2d 1123 (5th Cir. 1974). The Eighth Circuit case dealt with the adequacy of the EIS filed by the Corps of Engineers in connection with another dam-flood control project. The Fifth Circuit was confronted with an action by environmentalists to enjoin the construction, by the Federal Government, of a navigation project (i.e., the building of an inland waterway).

29. 162 U.S.App.D.C. at 376, 499 F.2d at 512.

30. *Id.* 162 U.S.App.D.C. at 374, 499 F.2d at 510.

31. Id.

32. 500 F.2d 328 (2d Cir. 1974).

guishable from the case at bar. *Harlem Valley* was a suit to prohibit the Interstate Commerce Commission from going forward with rail abandonment proceedings [33] unless and until the ICC staff had, prior to any hearings on the matter, submitted a draft EIS. Abandonment of a railroad line has, of course, immediate and obvious environmental effect,[34] and such abandonment cannot be undertaken without Federal permission through the ICC. *Harlem Valley* is thus a case, much like Greene County Planning Board v. F.P.C.,[35] in which Federal permission is required for actions which will have an impact on the environment.

■ From its study of the legislative history of NEPA and of the case law surrounding the Act, the Court has concluded that NEPA was intended to apply to Federal actions having a reasonably substantial relationship to the quality of the environment. The Court concludes that such Federal actions as are controlled by NEPA may be seen as belonging to one of two broad categories. The first of these categories is that of direct Federal impact on the environment, e. g., a Federal construction project.[36]

The other category consists of actions taken by other persons which will have environmental impact and for which Federal permission is required.[37] The Court is bolstered in its conclusions by the statement of Judge Wright that NEPA applies to those situations in which

> an agency proposes to build a facility itself, [and] also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment.[38]

■ The Court believes that this view of the scope of NEPA is one which permits a harmonization of the legislative history which the Court has discussed, the language of the statute, the holdings of the cases and the fact that NEPA neither amends nor repeals any other statute. The question that now confronts the Court is to determine whether the situation at bar fits either of the categories described by Judge Wright. The Court thinks it evident that the FTC action does not fit into the first of the described categories, leaving only the second category to be considered.

---

33. Railroads must seek and receive the permission of the ICC to abandon service on rail lines. *See* City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972). That permission may be affirmatively given or it may be presumed by ICC inaction for a given period. *Id.* In the latter case it is subject to revocation.

34. The abandonment would mean an increase in other forms of transport, more road usage, etc. *See City of New York, supra,* note 33.

35. *See supra* note 25 and accompanying text.

36. In this category we may include the situations found in Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972) (construction of an office-jail complex) ; Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972) (same as Hanly v. Mitchell) ; Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972) (flood control project) ; Environmental Defense Fund v. Corps of Engineers, 492 F.2d 1123 (5th Cir. 1974) (building of inland waterway) ; Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th

Cir. 1972) (construction of an interstate highway) ; Jones v. D.C.R.L.A., 162 U.S. App.D.C. 366, 499 F.2d 502 (1974) (Federal urban renewal project) ; Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal. 1972) (highway construction) ; Morningside-Lenox Park Assoc. v. Volpe, 334 F. Supp. 132 (N.D.Ga.1971) (highway construction).

37. Examples of this category are Calvert Cliffs' Coord. Comm. v. A.E.C., 146 U.S. App.D.C. 33, 449 F.2d 1109 (1971) (licensing and construction permits for power plants) ; Greene County Planning Bd. v. F. P.C., 455 F.2d 412 (2d Cir. 1972) (permission to erect a high-voltage power line) ; Harlem Valley Transport Assoc. v. Stafford, 500 F.2d 328 (2d Cir. 1974) (abandonment of a rail line) ; City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972) (three-judge court) (abandonment of a rail line).

38. Scientists Inst. for Pub. Info., Inc., v. A. E.C., 156 U.S.App.D.C. 395, 404, 481 F.2d 1079, 1088 (1973).

It is well to note at the outset that the Cement Guidelines are simply a statement of the agency's views.[39] Thus the Guidelines are not regulations and do not have the force of law. They rise at most to the level of what Professor Davis would describe as "interpretive rules." [40] These Guidelines are but a pronouncement of the FTC's opinion regarding what constitutes a valid and appropriate merger under Federal antitrust law. It is a shorthand way of warning the public about those mergers which might be deemed improper by the FTC. The Guidelines attempt to relieve the public of the onerous task of making its own determination, in each case, regarding validity of a merger. The public is thus made aware of what the FTC considers an antitrust violation and of what will trigger an inquiry.

This being so, the Court does not believe that NEPA applies to the formulation and continued existence of the Guidelines themselves. Still open is the question whether NEPA applies to the decision to initiate law-enforcement adjudicatory proceedings, a decision to which the Guidelines are but an index.

The Court thinks that this is not a case in which Federal permission is required before an action can be undertaken. Business firms can (and do) merge in defiance of FTC guidelines. The merger can be carried out, although there is a risk that Federal action will later be taken to void the acquisition. That is exactly what happened in the present case. Moreover, the sand and gravel firm, Becker, which was engaged in strip-mining before its acquisition by plaintiff is still so engaged and will continue to be so engaged whether under the ownership of plaintiff or under its own aegis.

Thus, it appears that FTC action, even if it results in divestiture by GFH of its interest in Becker, will have no impact on the environment. Indeed, the only possible environmental effect suggested by GFH is that it might be required itself to mine sand and gravel for its own use if it must rid itself of Becker. This, says GFH, raises the spectre of a possible proliferation of strip mines around the landscape. This spectre does not seem to the Court to be a very imposing phantom. GFH would be free, even after divestiture, to fill its needs for sand and gravel from Becker, which would presumably not spurn efforts to buy large amounts of its product. The need to launch additional strip mines seems at best to be exceedingly speculative. Furthermore, GFH is presently free to decide that it needs more mines and to cause its subsidiary, Becker, to create them. The possible proliferation of strip mines does not seem realistically related to any decision in the case before the FTC.

■ For the foregoing reasons, the Court is of the opinion that the FTC decision to initiate antitrust enforcement proceedings against GFH is not within the range of situations to which NEPA was intended to apply. The FTC determination to take action does not seem substantially, or even reasonably, related to the quality of the human environment. Divestiture, at least in the situation here presented, is not that sort of action which will have an effect on the environment. The case might conceivably be different if FTC approval of a merger were required, but that is not

---

39. *See* 16 C.F.R. § 17.1(a). Sec. 17.1(a) reads as follows:

Industry guides are administrative interpretations of laws administered by the Commission for the guidance of the public in conducting its affairs in conformity with legal requirements. They provide the basis for voluntary and simultaneous abandonment of unlawful practices by members of industry. Failure to comply with the guides may result in corrective action by the Commission under applicable statutory provisions. Guides may relate to a practice common to many industries or to specific practices of a particular industry.

40. K. Davis, Administrative Law Treatise, §§ 5.03, 5.04. So-called "legislative rules" are binding on the courts in and of themselves while interpretive rules are not.

the case before the Court. For the reasons foregoing, it appears to the Court that GFH has not shown a probability of success on the merits.[41]

There are other reasons for the Court's opinion on plaintiff's probability of success. Should NEPA be applied as plaintiff suggests, logic would compel its application to other situations which the Court regards as plainly beyond the ambit of NEPA. Thus, NEPA could be applied to actions of the S.E.C. requiring divestiture of stock where the securities laws have been violated. Such an action is strikingly similar to that before the Court. NEPA could also be applied to F.D.A. actions regarding prohibition of certain drugs. It could be applied to decisions of the Justice Department regarding possible institution of civil or criminal litigation (antitrust suits leap to mind). Yet the Court thinks that these situations were never intended to come under NEPA. So it is with the case at bar.

### (2) *Irreparable Harm.*

The Court does not think that plaintiff has made a showing of possible irreparable harm in this case. The case of Jones v. D.C.R.L.A.[42] does not alter the Court's views in that regard. There the Court of Appeals said that the kind of harm against which NEPA was directed was not adverse consequences to the environment but rather the possibility that decisions about Federal actions would be taken without consideration of the environmental effects of such action and after a determination that the benefits would outweigh any adverse effects.[43] *Jones* was, however, a case squarely within the first of the broad categories discussed *supra*; that is, it dealt with direct Federal action affecting the environment (an urban renewal project). The Court's statement there was thus in the context of a situation in which there were obvious and direct effects on the environment. That is not the case at bar. In the present case, any environmental effect is speculative and not related to the proposed Federal action.

The only other basis for a finding of irreparable harm is plaintiff's participation in the adjudicatory proceedings. Such participation is not usually considered to be irreparable harm. *See* Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24, 94 S.Ct. 1028, 39 L. Ed.2d 123 (1974); Myers v. Bethlehem Shipping Corp., 303 U.S. 41, 51–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

The Court concludes that no irreparable harm, cognizable under NEPA, has been shown where any effect on the environment will neither be a result of Federal action nor permitted by Federal action but will result, if at all, from unrelated private action. No other basis for finding irreparable harm has been shown.

### (3) *Balance of Harms.*

The Court has no difficulty in concluding that the balance of harms favors the FTC position here. The adjudicatory proceedings at issue here would be completely halted and a possible anti-

---

41. The Court is aware of the Affidavit of Mary Todd Foldes, an employee of the FTC, filed herein. Mrs. Foldes states that she has been in continuing contact with staff members of the Council on Environmental Quality and that the Council has expressed its agreement with the FTC's exclusion of its adjudicatory proceedings from the application of NEPA. This is, of course, hearsay and would not be proper for consideration at trial or on a motion for summary judgment. Professor Moore, however, states that such statements may be considered for whatever they are worth at the preliminary injunction stage of a case. J. Moore, Federal Practice (2d ed.), ¶ 65.04[3] at 65–64, 65–65. The Court is inclined to agree but found it unnecessary to base any of its present conclusions upon the Foldes affidavit. An appropriate showing of CEQ approval of FTC practices would naturally have had a persuasive effect on the Court, but the Court cannot consider the Foldes affidavit to be such a showing.

42. 162 U.S.App.D.C. 366, 499 F.2d 502 (1974).

43. *Id.,* 162 U.S.App.D.C. at 376, 499 F.2d at 512.

trust violation permitted to continue if the injunction is granted. On the other side of the scale is only a remote and speculative possibility of some environmental impact at a future date as a result of completely private action. It seems to the Court that the harm to the national economy within the jurisdiction of the FTC would be the greater.

(4) *Public Interest.*

Two public policies, one of encouraging competition and the other of encouraging consideration of environmental factors in decisionmaking, are in apparent conflict here. Upon closer examination, however, no real clash exists. NEPA, as was pointed out *supra*, was intended to apply to decisions in one of two broad categories. The situation here fits neither category. Hence, the public interest would be served by denying the preliminary injunction and allowing the FTC adjudicatory hearing to proceed.

SUMMARY

The Court concludes that plaintiff has shown none of the elements necessary for the issuance of a preliminary injunction. Accordingly, that injunction should be denied.