Glenn L. WHITMAN, and Janet E. Whitman, d/b/a Osage Outdoor Advertising, Plaintiffs,

v.

STATE HIGHWAY COMMISSION OF MISSOURI et al., Defendants.

No. 1793.

United States District Court,
W. D. Missouri, C. D.

May 6, 1975.

Alex Bartlett, Jefferson City, Mo., for plaintiffs.

Paul F. Tochtrop, Jefferson City, Mo., for State Highway Comm.

Vernon Poschell, Asst. U. S. Atty., Kansas City, Mo., for defendants.

### FINDINGS AND OPINION

ELMO B. HUNTER, District Judge.

This is an action for declaratory and injunctive relief arising out of a highway relocation and improvement project on U. S. Highway 54, a federal-aid primary highway, in Miller County, Missouri. Plaintiffs at all times relevant to this litigation were husband and wife, and were doing business as Osage Outdoor Advertising. Defendant State Highway Commission of Missouri (the Commission) is an entity created under the Constitution and Laws of the State of Missouri, and is authorized to sue and be sued in its own name. § 226.100 RSMo. (1969). The Commission is authorized by Missouri law to exercise the power of eminent domain. Robert L. Hyder, formerly a defendant in this action, was during all times pertinent to this case, and until his retirement on February 28, 1974, Chief Counsel of the defendant Commission and had been appointed and authorized to act pursuant to § 226.060 RSMo. (1969). The federal defendants are Claude S. Brinegar, Secretary of Transportation of the United States (successor to John A. Volpe) and Norbert T. Tiemann, Administrator of the Federal Highway Administration,

United States Department of Transportation (successor to F. C. Turner).

Plaintiffs allege that they were and are the owners of various outdoor advertising structures (billboards) located pursuant to leases negotiated with the property owners, on property adjacent to U. S. Highway 54 prior to the improvement project. They contend that the property upon which these structures were located was acquired by the Commission for the Highway 54 project, that plaintiffs were required to remove or destroy the structures without any form of compensation, and that the underlying leasehold interests were taken by the Commission without payment of just compensation.

Initially, plaintiffs contend the Commission violated various provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4601–4655 (1971) (hereinafter, the URA). In this regard they seek an order of this Court requiring the Commission to specifically comply with §§ 301–305 of the URA (42 U. S.C. §§ 4651–4655) with respect to the billboards. In particular, plaintiffs assert that the Commission must purchase the signboards in question and compensate plaintiffs under the provisions of § 302 of the URA (42 U.S.C. § 4652).[1]

Second, plaintiffs assert that the Commission took the underlying leasehold interests without due process and without payment of just compensation in violation of the fifth and fourteenth amendments to the United States Constitution and various provisions of Missouri law. In this regard they seek an award of just compensation for the property allegedly taken.

Finally, plaintiffs request a review of the determinations of the Secretary of Transportation and the Federal Highway Administration (the federal defend-

---

1. Plaintiffs assert that if they are not entitled to compensation under these sections of the URA, that they are entitled to compensation under the relocation assistance provisions of the URA, or under previous statutes relating to relocation assistance on federal-aid projects.

ants) approving federal financial assistance for the Highway 54 project.

Defendants have moved to dismiss the complaint on several alternative grounds, including lack of jurisdiction, failure to state a claim upon which relief can be granted, and, with respect to the Commission, that this cause is barred by the eleventh amendment to the United States Constitution. By previous order, disposition of these motions was postponed until the trial of the case on the merits.

The issues are raised by plaintiffs' first amended complaint, the answers of defendant thereto, the motions to dismiss of each defendant, and by Standard Pretrial Order No. 2. Trial to the Court commenced on June 3, 1974 and concluded on June 5, 1974. Final posttrial briefs were submitted in November, 1974, and an agreed upon form of Standard Pretrial Order No. 2, including stipulations of facts and admissions of parties, was submitted by the parties on March 4, 1975.

### Jurisdiction

Plaintiffs assert that this Court has subject matter jurisdiction over plaintiffs' claims under the URA under the provisions of 28 U.S.C. § 1331(a) in that the issues present a federal question and the amount in controversy exceeds the sum or value of $10,000.00. Alternatively, plaintiffs contend that jurisdiction is present under 28 U.S.C. § 1337 as this case arises under an act of the Congress regulating commerce, or under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Under this alternative theory, plaintiffs assert the pendent jurisdiction of this Court with regard to their claims against the Commission.

For the reasons set forth below, this Court has concluded that jurisdiction is present under 28 U.S.C. § 1331(a) as to plaintiffs' claims against the Commission, as these claims for relief arise under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, and the matter in controversy exceeds the sum or value of $10,000.00.[2] The Court has concluded that the eleventh amendment does not bar this action as against the Commission. Concerning plaintiffs' claims against the federal defendants jurisdiction is present under the Administrative Procedure Act to review the determinations of the federal defendants in funding the Highway 54 improvement project. The Court will decline to exercise pendent jurisdiction with regard to plaintiffs' claims for just compensation for the underlying leasehold interests.

Congress had a twofold purpose in enacting the URA. First, the purpose of the relocation assistance provisions was to establish a uniform policy for treatment of individuals displaced as the result of federal or federally assisted projects. See URA § 201 (42 U.S.C. § 4621). Second, Congress intended the real property acquisition policies sections to bring about uniform nationwide procedures for the taking of property by the federal government or state agencies receiving federal assistance. *Will-Tex Plastics Mfg., Inc. v. Department of HUD*, 346 F.Supp. 654 (E.D.Pa.1972).

The real property acquisition policies of the URA are contained, generally, in §§ 301–305 (42 U.S.C. §§ 4651–4655). Sections 301–304 by their terms apply to federal agencies in the acquisition of real property for federal projects. Section 301 (42 U.S.C. § 4651) establishes nine separate practices and guidelines for federal agencies to follow in the acquisition of real property. Section 302 (42 U.S.C. § 4652) mandates that an agency acquiring real property also acquire an equal interest in any building,

2. 28 U.S.C. § 1331(a) provides: "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."

structure or improvement on such property which will be required to be removed, or which will be adversely affected by the use of such property, and sets forth a method for compensation to be paid to the owner of any such structure or building.

Section 303 (42 U.S.C. § 4653) involves compensation and reimbursement to the owner of property acquired for certain expenses involved in and incidental to the transfer of title to the United States. Section 304 involves payment by the acquiring agency of certain litigation expenses in limited circumstances.

Section 305 of the URA (42 U.S.C. § 4655) makes the provisions of the preceding sections obligatory upon the states as a condition to the receipt of federal financial assistance. This section provides as follows:

"Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contract or agreement with, a State agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property on and after January 2, 1971, unless he receives satisfactory assurances from such State agency that—

"(1) in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 301 and the provisions of section 302, and

"(2) property owners will be paid or reimbursed for necessary expenses as specified in sections 303 and 304."

Plaintiffs' primary claim in this case is that the Commission has failed to comply with § 305 of the URA in its real property acquisitions for the U. S. Highway 54 project. In particular, plaintiffs assert that the Commission has failed to comply with the provisions of §§ 301 and 302 to "the greatest extent practicable under State law" as is required by § 305.[3]

Defendants contend that federal question jurisdiction cannot be properly invoked pursuant to §§ 301, 302 or 305 for the reason that none of these sections grant any rights to the plaintiffs that are subject to judicial enforcement. In this context they refer the Court to § 102 of the URA (42 U.S.C. § 4602), which provides as follows:

"(a) The provisions of Section 301 of Title III of this Act (42 U.S.C. § 4651) create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation.

"(b) Nothing in this Act shall be construed as creating in any condemnation proceedings brought under the power of eminent domain any element of value or of damage not in existence immediately prior to the date of enactment of this Act."[4]

With regard to § 102(a), it has been held that this section precludes judicial review of action allegedly taken in violation of § 301, and precludes judicial enforcement of that section. In an exhaustive opinion in *Barnhart v. Brinegar*, 362 F.Supp 464 (W.D.Mo.1973), Judge William R. Collinson reviewed the entire history of these sections and concluded:

". . . Congress intended section 102(a) to preclude judicial review of federal and state agency actions under the real property acquisition practices of section 301 of the Act. The intend-

---

3. The Commission asserts that the central question raised concerns the validity and effect of the 1965 Missouri billboard law. However that issue, in the context of this case, relates to whether the Commission has complied with §§ 301–302 to the greatest extent practicable under Missouri law, as is required by § 305. The central question

raised by plaintiffs is the alleged noncompliance by the Commission with §§ 301 and 302.

4. The URA was enacted and effective on the date it was signed by President Nixon, January 2, 1971.

ed result is accomplished two ways. First, if one has no rights under section 301, then one cannot be adversely affected or aggrieved by agency action. This bars review of federal agency decisions under the Administrative Procedure Act. Secondly, if one has no rights under section 301, we conclude that an action against a state agency under section 301 does not "arise under" the Constitution or laws of the United States within the meaning of 28 U.S.C. § 1331(a) (1970). Federal question jurisdiction is thus effectively barred. As a matter of compromise, Congress passed section 301 as an expression of congressional policy and entrusted the faithful execution of its stated policy solely to the administrators of the Act." *Barnhart v. Brinegar, supra*, at 472.

■ This Court is in agreement with the rationale of Judge Collinson in *Barnhart,* and it is therefore concluded that jurisdiction cannot be invoked under 28 U.S.C. § 1331(a) or under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704 to consider plaintiffs' claim that the defendants have failed to comply with § 301.[5]

However, plaintiffs' claims predicated upon alleged violations of §§ 302, 305 of the URA are not subject to the same analysis. First, § 102(a) is expressly limited in its application to § 301, as by its very explicit terms it applies only to that section. A review of the legislative history pertaining to § 102 reveals that this section was enacted pursuant to a compromise between the House and Senate versions of the original bill. This compromise deleted a specific provision of the House Bill barring judicial review of agency action under all sections of the URA. The deleted portion provided that no provision of the URA shall be construed "to give any person a cause of action in any court". The elimination of that language clearly indicates that the Congress did not intend to prevent judicial review of agency actions under sections of the URA other than § 301.[6]

■ Nor can § 102(b) of the URA be asserted in this case as a bar to judicial review of agency action allegedly in violation of §§ 302, 305. By its explicit terms, § 102(b) requires that nothing contained in the URA shall be construed to create any element of value or of damage not in existence prior to the effective date of the URA, January 2, 1971, "in any condemnation proceedings brought under the power of eminent domain". The instant action is not a condemnation proceeding brought pursuant to the power of eminent domain, and § 102(b) is therefore inapplicable to this case.[7]

5. See also *Will-Tex Plastics Mfg., Inc. v. Dept. of HUD,* 346 F.Supp. 654 (E.D.Pa. 1972) ; *Rubin v. Dept. of HUD,* 347 F.Supp. 555 (E.D.Pa.1972) ; and *Paramount Farms, Inc. v. Morton,* 384 F.Supp. 1294 (W.D. Wis.1974).

It is further worth note in this context that as § 301 creates "no rights or liabilities", a claim under this section fails to state a claim upon which relief can be granted.

6. For an excellent discussion of this legislative history see *Barnhart v. Brinegar, supra,* 362 F.Supp. at 466–71.

7. Defendants assert that various cases have held that judicial review of or enforcement of §§ 302, 305 is precluded. A careful analysis of these cases reveals that no such holding was made. *Barnhart v. Brinegar,*

*supra,* held only that actions based upon violations of § 301 are barred, and not actions based on other portions of the URA. A careful reading of *Will-Tex Plastics Mfg., Inc. v. Dept. of HUD,* 346 F.Supp. 654 (E. D.Pa.1972) reveals that the Court only held that actions predicated upon violations of § 301 are prohibited. The claim in *Will-Tex* brought pursuant to § 302 was dismissed because the acquisition of the property in that case took place before the effective date of the URA, and therefore § 302 did not apply. Similarly, in *Rubin v. Dept. of HUD,* 347 F.Supp. 555 (E.D.Pa.1972) the Court held that the URA did not apply for the reason that the property had been acquired upon the filing by the acquiring agency of the "Declaration of Taking", said date being before the effective date of the URA. The Court in *Rubin* further held that the plain-

Although this is apparently the first instance in which a federal district court has been called upon to enforce the provisions of §§ 302, 305, and to review agency actions under those sections with regard to property acquired after the effective date of the URA, a number of recent cases have held that sections of the URA, other than § 301, are judicially enforceable, and that agency action under those sections is subject to judicial review. See *Tullock v. State Highway Commission of Missouri*, 507 F.2d 712 (8th Cir. 1974); *Jones v. District of Col. RDA*, 162 U.S.App.D.C. 366, 499 F.2d 502 (D.C. Cir. 1974); *Beaird-Poulan, Inc. v. Dept. of Hys. of La.*, 497 F.2d 54 (5th Cir. 1974); *Lathan v. Volpe*, 455 F.2d 1111 (9th Cir. 1971); *La Raza Unida v. Volpe*, 337 F.Supp. 221 (N.D.Cal.1971) *affirmed* 488 F.2d 559 9th Cir. 1973) *cert. den.* 409 U.S. 890, 93 S.Ct. 105, 34 L.Ed.2d 147; and *Lewis v. Brinegar*, 372 F.Supp. 424 (W.D.Mo. 1974).

 In view of the above, the Court concludes that §§ 302, 305 of the URA are judicially enforceable, and that plaintiffs' claims against the Commission for injunctive relief under the provisions of §§ 302 and 305 of the URA based upon alleged violations of those sections present a federal question under the provisions of 28 U.S.C. § 1331(a). Further, the jurisdictional amount re-

quirement of that section is satisfied in this case.[8]

 Concerning plaintiffs' claim against the federal defendants, jurisdiction is present under the Administrative Procedure Act to review the agency determinations. Pursuant to that act, the Court may review final federal agency determinations unless review is precluded by statute or the agency action is committed to agency discretion by law. 5 U.S.C. §§ 701–706 (1970). Review of agency actions under §§ 302, 305 of the URA is not precluded by statute, and the actions of the federal defendants under these sections are not committed to agency discretion. Section 305 *requires* the federal agency to secure the necessary assurances from the State agency before acting under that section, and § 211(c) of the URA (42 U.S.C. § 4631(d)) *requires* the amendment of federal-state agreements that were in existence prior to the effective date of the URA to conform to §§ 210 (42 U.S. C. § 4630) and 305 of the URA. Cf. *Lewis v. Brinegar*, 372 F.Supp. 424 (W. D.Mo.1974).[9]

 In addition to its assertion of the absence of jurisdiction under federal statutes, the Commission asserts that this action is barred by the eleventh amendment to the Constitution.[10] Although plaintiffs contend that this de-

---

tiffs did not state a cause of action for benefits under the URA because the property had been acquired by condemnation, and accordingly § 102(b) applied to prevent consideration of any element of value or damage not in existence prior to the URA. *Rubin* is clearly distinguishable from the instant case. Nothing contained in *Rubin* indicates that §§ 302–305 of the URA are not judicially enforceable where the property is acquired after the effective date of the URA by means of negotiated purchase rather than condemnation.

8. The parties have stipulated that the amount in controversy with regard to any particular advertising structure does not exceed $10,000.00, but that as to all structures involved in this case the amount in controversy does exceed that sum. It appears, and there has been no contention to the con-

trary, that all of plaintiffs' claims for compensation under § 302 for sign structures are property joined under Rule 18(a) F.R. Civ.P., and plaintiffs' claim for each structure arises out of the same sequence of events. As such these claims may be aggregated for purposes of the jurisdictional amount requirement. See *Moore's Federal Practice*, Vol. 1, § 0.97.

9. It is worthy to note that even were independent federal question jurisdiction not present with respect to plaintiffs' claims under the URA against the Commission, this Court would then determine whether to exercise its pendent jurisdiction with respect to those claims. Cf. *Lewis v. Brinegar*, supra, 372 F.Supp. at 428.

10. "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted

fense was not timely asserted under Rule 12, F.R.Civ.P., the amendment, where applicable, is sufficiently in the nature of a jurisdictional defect that it may be raised at any stage of the proceeding.

An unconsenting state is immune to suit in federal courts by its own citizens under the amendment, as well as suits by citizens of other states or nations. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, claims for prospective injunctive relief against state officials are not barred by the eleventh amendment. *Edelman v. Jordan, supra; Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Tullock v. State Highway Commission of Missouri,* 507 F.2d 712 (8th Cir. 1974). At the time that plaintiffs brought this suit, the signboards in question were located on the property the Commission had acquired for the project. At that time plaintiffs were seeking an injunction prohibiting the Commission from requiring the removal of or removing any of these structures, or from otherwise interfering with any property rights of plaintiffs, until such time as the Commission complied with the provisions of §§ 301 and 302 of the URA. Therefore, plaintiffs sought only prospective injunctive relief against the Commission.

Subsequent to the filing of the initial complaint, plaintiffs and the Commission on April 17, 1972, entered into a stipulation providing that plaintiffs would remove the structures lying within the right-of-way for the U. S. Highway 54 project

"without such being in any manner considered as an abandonment or waiver of any rights that they may have with respect to the sign structures or to the premises upon which the sign structures are now located . . . . ."

\* \* \* \* \* \*

"The state defendants further agree that any such movement shall be without prejudice to any rights of the plaintiffs to compensation with respect to the parcels of land set forth in the complaint or sign structures located thereon within the right-of-way on said project, and shall further be without prejudice to any rights of the plaintiffs to relocation assistance under the provisions of the Uniform Relocation Assistance and Land Acquisition Policies Act or prior law."

The effect of this stipulation is inescapable. The rights and liabilities of the parties with respect to the sign structures were established as of the date of the stipulation.[11] Viewing this matter from that point in time, plaintiffs seek prospective injunctive relief only, and do not claim damages for any prior breach of a legal duty. As such, it is clear that the eleventh amendment does not bar plaintiffs' claims against the Commission under §§ 302, 305 of the URA. *Edelman v. Jordan, supra; Tullock v. State Highway Commission of Missouri, supra;*[12] *La Raza*

---

against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

11. The obvious purpose of the stipulation was to permit construction on the Highway 54 improvement project to continue on a normal schedule, and not be delayed pending resolution of this litigation, and at the same time to prevent the rights or liabilities of the parties from being altered by the subsequent physical removal of the sign structures as construction made removal necessary.

12. This decision is entirely consistent with and follows the recent decision of the Eighth

Circuit in *Tullock.* In that case, the plaintiff contended that she was entitled to an injunction requiring the Commission to comply with the relocation assistance provisions of the URA before being evicted from her dwelling. Citing both *Edelman v. Jordan, supra,* and *Ex Parte Young, supra,* the Court held that the eleventh amendment did not bar plaintiff's complaint. Viewing the instant case from the date of the stipulation, and with the exception that plaintiff's claims in *Tullock* arose under the relocation assistance provisions of the URA rather than the real property acquisition provisions, Mrs. Tullock's situation was almost identical to the situation of plaintiffs in this case.

*Unida v. Volpe,* 337 F.Supp. 221 (N.D. Cal.1971), affirmed 488 F.2d 559 (9th Cir. 1973), *cert. den.* 409 U.S. 890, 93 S. Ct. 105, 34 L.Ed.2d 147.[13]

Concerning plaintiffs' claims against the Commission for just compensation for the alleged taking of the apparent leaseholds,[14] it does not appear, and plaintiffs do not contend, that the matter in controversy with regard to the leases exceeds the sum or value of $10,000.00. Therefore, even though plaintiffs' claims in this regard present a federal question under the fifth and fourteenth amendments, the original jurisdiction of this Court under 28 U.S.C. § 1331(a) cannot be invoked, and these claims must be considered state claims. See *Lewis v. Brinegar,* 372 F.Supp. 424, 428 (W.D.Mo.1974).

▆▆▆ The question presented is whether this Court will exercise its pendent jurisdiction to consider these claims. There is no doubt that this Court has the power to exercise its pendent jurisdiction in this regard. An independent basis of federal jurisdiction is present with regard to plaintiffs' claims under the URA, the state and federal questions derive from a common nucleus of operative fact (the property interests were taken at the same time the structures were required to be removed), and the claims are such that plaintiffs could ordinarily expect to try them in one judicial proceeding. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16

L.Ed.2d 218 (1966). But the doctrine of pendent jurisdiction is not a doctrine of plaintiffs' right, and need not be exercised in every case where there is power in the federal court to hear the pendent claims. Rather, the exercise of pendent jurisdiction is committed to the sound discretion of the district court under the peculiar facts and circumstances of the particular case at bar. *United Mine Workers v. Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. 1130.

▆▆▆ In this case, although the Commission allegedly took plaintiffs' underlying property interests at the time it acquired the fee interest in the property, and at the time it required removal of the advertising structures located thereon, the claims of plaintiffs relating to these interests are otherwise totally distinct and separate from plaintiffs' claims relating to the billboards under the URA. For reasons stated infra in this opinion, a compensable real property interest is not a prerequisite to compensation for "structures" under the URA, and for purposes of plaintiffs' URA claims it is not necessary to determine the exact nature of the property interests held.

However, in order to determine whether plaintiffs will succeed on their claims relating to the taking without payment of just compensation of these property interests, those determinations will be necessary. For it is clear that the amount of just compensation, if any,

13. In view of this determination, it is not necessary to consider whether the Commission waived its eleventh amendment immunity by accepting federal funds for this project. But see *Tullock v. State Highway Commission of Missouri, supra,* and *Lewis v. Brinegar, supra,* in this regard. Nor is it necessary to consider whether § 226.100 RSMo. (1969) constitutes a waiver of the Commission's eleventh amendment immunity. It is worth note, however, that although both *Tullock* and *Lewis* appear to reach this result, a State may waive its sovereign immunity and consent to be sued in its own courts without waiving its eleventh amendment protection against suit in federal courts. *Edelman v. Jordan, supra.* Fur-

ther, the Court expresses no opinion as to plaintiffs' contention that under Missouri law the Commission is not entitled to assert the sovereign immunity of the State, or its immunity under the eleventh amendment.

14. In using the term "leasehold" or "lease" in this context, no opinion is expressed as to the type, if any, of real property interest plaintiffs had in any of the property acquired by the Commission. These terms are merely used for convenience, as plaintiffs have referred to their interests as leaseholds, and as the various documents upon which plaintiffs base their right to erect and maintain the signboards are entitled "Lease of Ground Space For Signboard".

due to plaintiffs for the taking of any particular property interest, as opposed to "structure", will be determined, at least in part, by the exact nature of the interest plaintiffs held.

Plaintiffs, or their agents, negotiated and signed documents entitled "Lease of Ground Space For Signboard" on each property involved. In order to determine the nature of the interest held by plaintiffs in any particular parcel (e. g., a valid lease for a term of years, a tenancy at will or sufferance, or some sort of a license, etc.) it will be necessary to determine, with respect to each arrangement, at least the following: (1) the owners of each property at the time the document was signed; (2) whether all owners of a property signed the document and the effect of the failure of all owners to sign; (3) whether any non-signing owner can be estopped to deny the validity of the arrangement by knowledge of and acquiescence to it; (4) whether agents of the plaintiffs who signed the documents on plaintiffs' behalf had written authority to do so, and the effect under the Missouri Statute of Frauds of the failure to have such authority, if so; and (5) whether the Commission after acquiring a particular property, can assert any defects in the arrangements that the original property owners could assert. These determinations would require numerous findings of fact unrelated to any questions presented by plaintiffs' claims concerning the advertising structures under the URA, and would require technical and painstaking application of Missouri law to the facts found with regard to each arrangement to determine the exact interest, if any, held by plaintiffs.[15] Assuming that plaintiffs were determined to have a compensable property interest

in one or more of these parcels, a further evidentiary hearing would be required to determine the fair market value of whatever interest had been taken by the Commission. It is apparent that the evidence on that question would differ with respect to each interest.

 For these reasons, it is the opinion of the Court that the considerations of judicial economy and convenience would not be served by the exercise of pendent jurisdiction over these claims. Therefore, in the exercise of its discretion, this Court declines to exercise its pendent jurisdiction to consider plaintiffs' claims for compensation for whatever interests or rights they may have held in the property upon which their advertising structures were located. Accordingly, those claims will be dismissed without prejudice.

### Background of the Controversy

U. S. Highway 54 in Miller County, Missouri, is and at all times relevant to this case was a federal-aid primary highway, approved as such by the Federal Highway Administration (or its predecessor, the Bureau of Public Roads) and by the Commission, and is part of the state highway system of Missouri. On July 10, 1959, the Chief Engineer of the Commission submitted to the Bureau of Public Roads a request for program approval for a project to improve Highway 54 in Miller County for a distance of approximately thirteen miles from just east of Eldon, Missouri. This project, originally denominated Project No. F–306(4), was initially approved by the Bureau of Public Roads on September 8, 1959, and the Commission was authorized to proceed with preliminary engineering.

15. Although federal constitutional standards apply to determine whether a "taking" of property for which just compensation must be paid has occurred, the federal courts generally apply state law in determining the exact nature of any property interest or property right that has allegedly been taken. See *Jim Young Development Co. v. State*

*Highway Commission of Missouri*, No. 1632 (W.D.Mo.1974); *United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942); *Schiefelbien v. United States*, 124 F.2d 945 (8th Cir. 1942); *Johnson v. United States*, 479 F.2d 1383, 202 Ct.Cl. 405 (1973); *United States v. Certain Land*, 439 F.2d 670 (3d Cir. 1971).

On May 12, 1966 the Commission approved a five year program for highway development that included project No. F–54–3(11), which had originally been denominated project No. F–306(4). In June of 1967, the Commission requested approval of a change in termini of project F–54–3(11) to split out that portion between the Camden County line and State Route V, for an early contract letting. This change was approved by the Bureau of Public Roads and the split-out portion was denominated project No. F–54–3(17).

On May 20, 1970, the Commission and the Federal Highway Administration entered into a Federal-Aid Project Agreement for a project denominated F–54–3(23). This agreement was made for the purpose of right-of-way acquisition for project F–54–3(11) from State Route V north to 1.0 miles west of State Route FF, and provided for federal funds in the amount of $108,000.00 out of a total estimated project cost of $181,000.00. (Henceforth, this project and agreement shall be referred to as the right-of-way project and agreement).

This agreement was modified several times. On August 31, 1970, the total estimated cost was increased to the sum of $431,000.00, with the federal portion increased to $233,000.00, due to additional "ROW" (right-of-way) costs. For the same reason the agreement was modified on October 20, 1970 to provide for a total cost of $506,000.00 and a federal share of $271,000.00. On February 3, 1971, the agreement was again modified due to a "revised ROW estimate" to provide for a total cost of $541,670.00, with no increase in federal funding.

Finally, on August 27, 1971 the project agreement was modified for the final time. The description of the termini was changed to U. S. Highway 54 from State Route V north to ½ mile east of State Route 52. This reduced the length of the project from 10.600 miles to 6.261 miles. The cost was increased to $646,000.00 and the federal share increased to $336,714.00.

On June 10, 1971, the Commission formally gave its approval to the right-of-way project, and directed its chief counsel to acquire the needed right-of-way by purchase, or if necessary, by condemnation.

On November 15, 1971, the Commission requested approval from the Federal Highway Administration to split-out that portion of Project F–54–3(11) for which the right-of-way had been acquired (pursuant to the right-of-way project and agreement, project F–54–3(23)) for an early letting of the construction contract.[16] The construction project so described was denominated project No. F–54–3(26) (the construction project) and was approved by the Federal Highway Administration on November 24, 1971. On February 16, 1972, a formal Federal Aid Project Agreement was entered into by the Commission and the Federal Highway Administration for the construction project. The agreement, referring to the construction project now as project No. EMP–F–54–3(26), called for an estimated total cost of $5,736,344.00, of which the federal share was $2,867,897.00.

The right-of-way needed by the Commission for the Highway 54 improvement program included property adjacent to the old Highway 54 right-of-way, and specifically included land located on parcels denominated by the Commission as parcels No. 4, 14, 38, 43, 44, 49, 51, and 52. The right-of-way needed on each of these parcels included land located within 660 feet of the old Highway 54 right-of-way, between State Route V and State Route 52 in Miller County.[17]

16. The exact termini of the construction approval requested were U. S. Highway 54 from immediately east of State Route V to 0.5 miles east of State Route 52, a distance of 6.185 miles. This is essentially that portion of U. S. Highway 54 for which the right-of-way had been acquired under project F–54–3(23), the right-of-way acquisition project.

17. Each of the projects hereinabove mentioned involved various stages of the reloca-

In 1968 the Commission gave assurances to the Federal Highway Administration that it would comply with all provisions of Chapter 5 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 501 et seq.[18] The Commission did not, however, implement the provisions of this act to displacements of outdoor advertising structures.

The Commission, in a series of letters to the Federal Highway Administration in 1971 and 1972, agreed to, and gave assurances that it would fully comply with all provisions of the URA on all Federal-Aid highway projects in Missouri with regard to property acquired for such projects after January 2, 1971. In particular, in a letter to Mr. H. S. Hickman, Division Engineer of the Federal Highway Administration on February 4, 1971, Mr. Thomas A. David, then Director of Highways of the defendant Commission, stated that:

"The following assurances are formally presented to you pursuant to Section 305 of Public Law 91–646 (42 U.S.C. § 4655).

1. In the acquisition of real property, the State Highway Commission will be guided to the greatest extent practicable under the laws of the State of Missouri, by the land acquisition policies contained in Sections 301 and 302 of the above-described Public Law 91–646." (42 U.S.C. §§ 4651 and 4652)

In response to an inquiry from Mr. Hickman, Mr. David again assured him on February 12, 1971, that the Commission would comply with sections 301–305 of the URA.[19] And, in subsequent correspondence from Mr. David to Mr. Hickman the Commission further assured the Federal Highway Administration that it had and would comply with sections 301 and 302 on all property acquired after January 2, 1971.[20] Section 305 assurances were formally accepted by the Federal Highway Administration in May of 1972.[21]

tion and improvement of Highway 54 in Miller County between State Route V and State Route 52, and in particular included the planning and engineering for, the right-of-way acquisition for, or the construction and relocation of Highway 54 over parcels No. 4, 15, 38, 43, 44, 49, 51, and 52. Federal-Aid highway funds have been allocated and paid over to the Commission for part of the costs of planning, engineering, right-of-way acquisition, and construction of the Highway 54 project over these parcels, and certain funds are yet to be paid to the Commission by the Federal Highway Administration.

18. This was done by a letter to the Federal Highway Administrator from the Chief Engineer of the Commission on September 9, 1968, and by a letter from the Chief Engineer of the Commission to the Division Engineer of the Bureau of Public Roads on October 1, 1968. Chapter 5 of the Federal-Aid Highway Act of 1968, U.S.C. § 501 et seq. was repealed by the URA.

19. In this letter Mr. David assured Mr. Hickman that the Commission would comply with § 301. In regard to § 302, the letter indicated that the Commission would comply with § 302(a) and would acquire structures located on property pursuant to that section. The letter further indicated that the current

Missouri practice was for offers to be extended to fee owners for the total acquisition price, and for the tenant and owner to voluntarily agree upon any apportionment, but if condemnation was necessary for the Court to make any apportionments.

This letter further advised that the Commission would fully comply with § 303 of the URA, but indicated with reference to § 304 that the Commission would not pay sums to property owners in cases in which the State did not acquire or damage the property, or where the property was not acquired by condemnation, and further indicated that in the opinion of the Commission § 304 applied only to federal agencies.

20. This correspondence was contained in letters of October 1, 1971, January 14, 1972, and March 14, 1972. It is particularly worth note that in the March 14, 1972 letter Mr. David advised that with regard to §§ 301 and 302, "There is no inability to comply with these sections and none has been suggested."

21. It is further worth note in this context that the Commission considered the provisions of the URA to be fully applicable to all property acquisitions after January 2, 1971 on all Federal-Aid projects, even on projects commenced prior to that date. Hence, after receiving federal guidelines rel-

Plaintiffs' twenty-four sign structures involved in this case were located on those portions of parcels No. 4, 14, 38, 43, 44, 49, 51 and 52 that the Commission acquired for the Highway 54 improvement project right-of-way.[22] These signboards had been erected and were being maintained (prior to the Commission acquiring these properties) pursuant to agreements between plaintiffs and the property owners.[23]

The Commission initially appraised each of these properties prior to January 2, 1971, the effective date of the URA. Plaintiffs' sign structures were present on these properties at the time that these appraisals were conducted, and the Commission was aware that plaintiffs owned or claimed to own these structures. In making these appraisals, the Commission did not make any separate determinations as to the in place value, enhancement value, salvage value, or cost of moving any of plaintiffs' structures, for the reason that the Commission considered each of these structures to be violative of one or more provisions of the 1965 Missouri billboard act (§§ 226.500–226.600 RSMo 1969),

and subject to removal from the premises without compensation. As such, the Commission appraised the properties without taking into consideration plaintiffs' sign structures in any way, and then proceeded to negotiate with the property owners to purchase the needed right-of-way over each parcel involved.

The right-of-way needed on parcel No. 4 was acquired on December 3, 1970, and right-of-way needed on the remaining parcels was acquired on various dates in April, May, and June, 1971.[24] The Commission acquired the right-of-way over each parcel herein involved by negotiated purchase with the fee owners.[25] No amount of the sum paid to any property owner as just compensation for the property purchased included any amount for the sign structures located on such property, either separately or as such structures might increase the fair market value of such property. And, even though the right-of-way over parcels 14, 38, 43, 44, 49, 51, and 52 was acquired after the effective date of the URA, no new appraisals were conducted for the reason that the Commission considered the previously made appraisals

ative to implementation of the URA, the Commission contracted all individuals from whom it had acquired real property on and after January 2, 1971, and all other individuals whom it believed to be entitled to additional benefits under the URA and forwarded to these individuals instructions for claiming such benefits. Plaintiffs were not included in this group with respect to their sign structures located on the parcels herein involved.

22. Plaintiffs' sign structures were located on the various parcels as follows: signs 5 and 6 on parcel No. 4; sign (group) 55 on parcel No. 14; sign 11 on parcel No. 38; signs 12, 13, 14, 18, 20, 22, 23, and 25 on parcel No. 43; signs 27, 30, 33, 34, 35, and 37 on parcel No. 44; signs 38, 39, and 43 on parcel No. 49; sign 45 on parcel No. 51; and signs 47 and 49 on parcel No. 52.

23. These agreements were entitled "Lease of Ground Space for Signboard" (see footnote 14 at p. 1061, *supra*) and generally provided for a rental of ground space to plaintiffs for the purpose of erecting and maintaining an outdoor advertising structure or structures, for a set term of years at a given annual

fee, and granted plaintiffs access to the property for purposes of erection and maintenance of such structures. These agreements were entered into between plaintiffs (or one of their employees, for Osage Outdoor Advertising) and at least one of the property owners on each parcel.

24. Parcel No. 14 was acquired by the Commission on April 12, 1971; parcel No. 38 on June 8, 1971; parcel No. 43 on June 15, 1971; parcel No. 44 on June 9, 1971; parcel No. 49 in June of 1971; parcel No. 51 on June 3, 1971, and parcel No. 52 on May 13, 1971.

25. Had any property owner rejected the Commission's offer the Commission would have joined that parcel in a condemnation action, and would have named as defendants in such action all persons owning or claiming to own any interest in the property or in structures thereon, including owners of "illegal" signs. The plaintiffs were joined in this manner with respect to parcel No. 49, but the condemnation petition was dismissed by the Commission over the plaintiffs' objections when deeds were acquired from all persons claiming an interest in the property.

to have been in substantial compliance with the provisions of the URA.

Both prior and subsequent to the acquisition of the right-of-way plaintiffs and the Commission corresponded on various occasions concerning plaintiffs' sign structures located on the property acquired. In essence, the Commission sought the removal of these structures by plaintiffs without compensation, and plaintiffs asserted a right to be compensated.[26] No agreement was reached, and the Commission in January of 1972 advertised for bids for the construction of the Highway 54 project. Plaintiffs thereupon filed the complaint in this case.

On April 17, 1972 plaintiffs and the Commission entered into the stipulation previously described. Pursuant to that stipulation, as the construction reached the area of any particular sign or signs, these structures were removed, at the cost of the plaintiffs.

### Applicability of the URA

Plaintiffs contend that the Commission failed to comply with § 305 of the URA in that it failed to comply with § 302 to the greatest extent practicable under Missouri law when it attempted to require plaintiffs to remove their sign structures from the Highway 54 improvement project right-of-way without compensation. The initial question presented is whether § 305 applied to the Highway 54 right-of-way project under which the Commission purchased the property upon which plaintiffs' signs were located.

Pursuant to § 221(a) of the URA (42 U.S.C. § 4601 note) the provisions of the URA were generally effective on January 2, 1971, the date of enactment. However, under § 221(b) § 305 applied to a State on that date only to the extent that such state was able under its laws to comply with § 305.[27]

■ Both the express language of § 221(b) and the legislative history of this section clearly indicate that if a state was able under its law to comply with § 305 on January 2, 1971, then that section was fully applicable to such State on that date. To the extent that a State was unable under its law to comply with any portion of § 305 on that date, § 305 applied except only insofar as State law expressly prohibited compliance.[28]

In this case the parties have agreed that on and after January 2, 1971, Missouri law did not prohibit the Commission from complying with the URA, including §§ 302 and 305.[29] It further appears that the Commission did have specific statutory direction and authority to comply with § 305 as of January 2, 1971. In pertinent part, § 226.150 RSMo. (1969) provides as follows:

"The Commission is hereby directed to comply with the provisions of any act of congress providing for the distribution and expenditure of funds of the United States appropriated by congress for highway construction, and to comply with any of the rules or conditions made by the bureau of public roads of the department of agriculture, or other branch of the United

---

26. A more complete discussion of these negotiations appears *infra* in this opinion.

27. Section 221(b) provides: "Until July 1, 1972, §§ 210 and 305 shall be applicable to a State only to the extent that such State is able under its laws to comply with such sections. After July 1, 1972 such sections shall be completely applicable to all States."

28. The House report regarding § 221(b) states: "Subsections (a) and (b) of this section make the bill fully effective on the date of enactment, except insofar as a State agency is unable to comply fully with all of its provisions. The bill becomes fully effec-

tive in such a State as soon as it can comply with all provisions of the bill, and, in every case, after July 1, 1972. . . . The Committee believes that there is no justification for any delay in the effective date of the bill except as required by State law. . . ." House Report (Public Works Committee), No. 91–1656, Dec. 2, 1970, *U.S.Code Congressional and Administrative News*, 91st Congress, Second Session, (1970), Vol. 3 at pp. 5870.

29. Defendants have admitted this conclusion as fact. See p. 33 of Standard Pre-Trial Order No. 2.

States government, acting under the provisions of federal law in order to secure to the state of Missouri funds allotted to this state by the United States government for highway construction. . . . "

This section has been interpreted by the Missouri Supreme Court as requiring and authorizing the Commission to comply with all provisions of any act of Congress or administrative regulation upon which federal funds for highway construction may be conditioned, even if compliance would cause the Commission to violate the express terms of Missouri statutes. *Logan v. Matthews*, 330 Mo. 1213, 52 S.W.2d 989 (1932).[30]

▮▮▮ For these reasons the Court concludes that under Missouri law the Commission was able to comply with § 305 of the URA on and after January 2, 1971 on all federally-assisted projects. Thus, § 305 was fully applicable to the Commission on and after that date. § 221(a), (b). Cf. *Beaird-Poulan, Inc. v. Dept. of Hys. of La.*, 497 F.2d 54 (5th Cir. 1974) (U.S.App. pndg.).

In pertinent part § 305 provides as follows:

"Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contact or agreement with, a State agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will re-

sult in the acquisition of real property on and after January 2, 1971, unless he receives satisfactory assurances from such State agency that—

(1) in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 301 and the provisions of section 302 . . . ."

▮▮▮ It is apparent that Congress intended that § 305, if applicable to a state on January 2, 1971, be applicable to all property purchased or acquired by a state agency on a federally assisted project after that date, even if the initial project agreement between the federal and state agencies was entered into prior to that time. Clearly, Congress intended the URA to apply to federal and federal aid projects as of the date of its enactment, regardless of when the program or project under which property is acquired was initiated. The legislative history of § 221 demonstrates that Congress intended eligibility for benefits to rest upon enactment of the URA as to all property acquired after its effective date.[31] This congressional intent is further evidenced by § 211(c) (42 U.S.C. § 4631(c)) which in pertinent part provides as follows:

"Any grant to, or contract or agreement with, a State agency executed before the effective date of this title, under which Federal financial assistance is available to pay all or part of the cost of any program or project

---

30. The court in *Logan* noted that the purpose of this section was to "secure all of the funds allotted to the state by the federal government for road construction, and in order to accomplish that result . . . (the Legislature) . . . directed the state highway commission to comply with *any of the rules or conditions made by the federal government.*" (Emphasis added.)

31. The House Report (Public Works Committee) on § 221 (see footnote No. 1 at p. 28 supra) states:
 "The Committee believes that there is no justification for any delay in the effective date of the bill except as required by State law. It is recognized that the neces-

sary regulations cannot be issued upon enactment, and that initial payments may have to be temporarily delayed if the provisions are made effective as of the date of enactment. However, the inequities involved in denying relocation payments and assistance for displacements occurring during a period after the date of enactment, far outweigh the administrative burden. Eligibility for benefits rests upon enactment even though payments may be delayed pending implementing regulations . . . ." House Report (Public Works Committee) No. 91–1656, Dec. 2, 1970, *U.S.Code Cong. and Administrative News*, 91st Congress, Second Session (1970) Vol. 3 at pp. 5870–5871.

which will result in the displacement of any person on or after January 2, 1971, *shall be amended to include the cost of providing payments and services under sections 210 and 305. . . . "* (Emphasis supplied.)

Congress required by this section that federal-state project agreements pre-dating January 2, 1971 be amended to include the costs of payments and services under § 305 so that those payments and services would be provided on ongoing projects. The federal-state aid agreement under which the Commission acquired the needed right-of-way for the Highway 54 project is that type of agreement required to be amended by § 211(c).[32] It is therefore concluded that § 305 applied to all property acquired by the Commission on and after January 2, 1971 for the U.S. 54 improvement project right-of-way.[33] See *Beaird-Poulan, Inc. v. Dept. of Hys. of La.,* 497 F.2d 54 (5th Cir. 1974) (U.S.App. pndg.). *Will-Tex Plastics Mfg., Inc. v. Dept. of HUD,* 346 F.Supp. 654 (E.D.Pa.1972); *Rubin v. Dept. of HUD,* 347 F.Supp. 555 (E.D.

Pa.1972); *Lathan v. Volpe,* 455 F.2d 1111 (9th Cir. 1971) and *La Raza Unida v. Volpe,* 337 F.Supp. 221 (N.D.Cal. 1971), *affirmed* 488 F.2d 559 (9th Cir. 1973), *cert. den.* 409 U.S. 890, 93 S.Ct. 105, 34 L.Ed.2d 147.[34]

*Compliance with Section 305*

 Plaintiff's claims against the federal defendants rest upon their assertion that the federal defendants failed to secure the required satisfactory assurances from the Commission under § 305 with respect to the Highway 54 right-of-way acquisition project. In this context it will also be necessary to determine whether the right-of-way acquisition agreement was amended to include the cost of services under § 305 as required by § 211(c). In the absence of proper assurances and amendments, the federal defendants would be acting illegally in funding this project after the effective date of the URA. Cf. *Lathan v. Volpe,* 455 F.2d 1111 at 1126 (9th Cir. 1971).[35] Similarly, plaintiffs assert

---

32. It is clear that the May, 1970 federal-aid project agreement for the right-of-way acquisition for the Highway 54 improvement project is required to be amended by § 211(c), as this project resulted in the acquisition of property and the displacement of persons after January 2, 1971.

33. As parcel No. 4 in the project was acquired prior to January 2, 1971, the URA does not apply to the right-of-way acquired over parcel No. 4. See infra p. 1077 this opinion.

34. It is worth note that the Commission also reached this conclusion with respect to the Highway 54 project. The evidence clearly shows that the Commission advised all persons it thought would be entitled to benefits under the URA relative to property acquired after January 2, 1971 that such benefits would be forthcoming as soon as implementing regulations were issued, and the Commission advised all such individuals at a later time how to apply for such benefits.

The federal defendants also considered the URA fully effective on federally-assisted projects as of January 2, 1971. Immediately upon President Nixon signing the URA, the Federal Highway Administration notified all Regional Highway Administrators that the

law was effective, and advised them to require States to keep detailed records of all property acquired on federally-assisted projects after January 2, 1971 in order to facilitate retroactive payments when regulations were issued. In this context see also 49 C. F.R. § 25.5 (1974).

35. If it were established prior to federal funds being paid out to the Commission under the agreement that the required assurances had not been secured, the remedy would be to prohibit the federal defendants from releasing such funds to the Commission. In this case, as most of the funds have been paid over to the Commission under the right-of-way acquisition agreement, that remedy would only result in a small percentage of the funds being withheld. In such circumstances, where substantially all of the funds have been paid over to the State agency involved, and the project has been ongoing under the agreement, a proper remedy is to direct the state agency using such funds to comply with the URA. *Jones v. District of Columbia R.L.A.,* 162 U.S. App.D.C. 366, 499 F.2d 502 (1974). In such circumstances it is too late for a state to withdraw from a project and return the federal funds Cf. *La Raza Unida v. Volpe,* 488

that the Commission has failed to comply with the provisions of § 305 in that it did not give satisfactory assurances under § 305, did not comply with the assurances it did give with respect to plaintiffs' sign structures, and in any event did not comply with the requirements of § 305.

Regarding the question of the assurances under § 305, Mr. David's letter of February 4, 1971 to Mr. Hickman specifically assured the Federal Highway Administration that the Commission would be guided to the greatest extent practicable under State law by the provisions of §§ 301 and 302. The February 12, 1971 letter, while indicating what the present practice of the Commission was with respect to the various rights of landlords and tenants on property to be acquired, did not indicate that Missouri law required such a practice on property acquired by negotiable purchase. The subsequent correspondence completely assured the Federal Highway Administration that the Commission was totally able to and would comply with the provisions of § 302 on all property acquired after the effective date of the URA on federally assisted projects. With respect to the assurances required by § 305 regarding compliance with § 302, these assurances were satisfactory.[36] Thus, plaintiffs' claim against the federal defendants founded upon the alleged failure to secure statisfactory § 305 assurances with regard to § 302 is without merit and cannot be sustained.[37]

F.2d 559 (9th Cir. 1973), *cert. den.* 409 U.S. 890, 93 S.Ct. 150, 34 L.Ed.2d 147 (Op. below 337 F.Supp. 221 (N.D.Cal.1971)).

36. The assurances were made on a statewide basis, and not on a project by project basis. One Court of Appeals has held that the assurances mandated by § 210 of the URA, relating to relocation assistance, must be on a project by project basis. *Lathan v. Volpe*, 455 F.2d 1111, 1125 (9th Cir. 1971). The relocation assistance provisions of the URA require the acquiring agency to provide relocation assistance' services to all types of displaced persons (e. g., dwelling owners, tenants, and businesses, etc.) including the *finding of suitable replacement housing for* certain individuals and the providing of certain advisory services for displaced individuals. Of necessity, the programs and services required to be offered for relocation assistance will vary with each particular project depending upon the type of property to be acquired and the uses to which such property is being put.

But this is not the case with the procedure outlined by the real property acquisition policies sections of the URA. These sections set forth procedures to be followed for the *acquisition of real property that can be* followed on all projects in a state. Implementation of these procedures would not require different planning for every project to which they apply, but these procedures are susceptible to one-time across the board implementation on all projects in a state. The need for specific project by project planning for relocation assistance to administer the benefits provided by § 210 is not present with respect to the procedures outlined in § 305.

For these reasons, the Court concludes that for purposes of § 305 project by project assurances are not required, and that statewide assurances by the state agency involved that it will comply with the requirements of § 305 in its real property acquisition policies satisfies the requirements of this section.

37. Similarly, plaintiffs cannot succeed on their claim against the federal defendants for allegedly failing to require amendment of the right-of-way acquisition agreement to include costs for payments and services provided under' the requirements of § 305. The evidence establishes that the right-of-way acquisition agreement was amended twice after January 2, 1971, on February 3, 1971 and August 27, 1971. Both of these amendments increased the project cost involved, but it is unclear whether either or both of these amendments were made for the specific purpose of including the cost of programs and services under § 305. It is clear, however, that neither of these amendments included costs under § 305 for any of the sign structures for which plaintiffs seek compensation in this case.

The reason that no such amendments were made was that the Commission did not consider § 305 to require the acquisition of plaintiffs' signboards. (The reason for the Commission taking this position is discussed *infra* this opinion.) As such, the Commission did not include costs for acquisition of these signboards in its project cost estimated to the Federal Highway Administration, and never requested the agreement to be amended to include such costs. Nor did plaintiffs specifically request the federal defendants to make such amendments.

However, as indicated above, the Commission did assure the federal defendants under § 305 that it would comply with the provisions of § 302 to the greatest extent practicable under Missouri law as to all property acquired on federally assisted projects on and after January 2, 1971. The Commission was therefore obligated to comply with the provisions of § 302 to the greatest extent practicable under Missouri law with respect to all property acquired for the Highway 54 right-of-way project after January 2, 1971. Cf. *Tullock v. State Highway Commission of Missouri,* 507 F.2d 712 (8th Cir. 1974).

It is plaintiffs' contention that § 305 required the Commission to purchase from plaintiffs the signboards in question pursuant to § 302(a) and to compensate plaintiffs for such signboards under the provisions of § 302(b)(1). Those sections provide as follows:

"(a) Notwithstanding any other provisions of law, if the head of a Federal agency acquires any interest in real property in any State, he shall acquire at least an equal interest in all buildings, structures, or other improvements located upon the real property so acquired and which he requires to be removed from such real property or which he determines will be adversely affected by the use to which such real property will be put.

"(b)(1) For the purpose of determining the just compensation to be paid for any building, structure, or other improvement required to be acquired by subsection (a) of this section, such building, structure, or other improvement shall be deemed to be a part of the real property to be acquired notwithstanding the right or obligation of the tenant, as against the owner of any other interest in the real property, to remove such building, structure, or improvement at the expiration of his term, and the fair market value which such building, structure, or improvement contributes to the fair market value of the real property to be acquired, or the fair market value of such building, structure, or improvement for removal from the real property, whichever is the greater, shall be paid to the tenant therefor."

The Court finds correct plaintiffs' assertion, which defendants do not seriously contest, that outdoor advertising structures of the type of plaintiffs' signboards are "structures" or "improvements" within the meaning of § 302.[38] Further, it is clear that with respect to these signboards the plaintiffs are "tenants" within the meaning of § 302(b)(1).[39]

Thus, the determination of whether § 211(c) requires the amendment of the Highway 54 right-of-way acquisition project agreement to include the cost of acquisition of plaintiffs' sign structures under § 305 rests entirely upon the correctness of the Commission's contention that its assurances under § 305 did not require the acquisition of plaintiffs' sign structures. Should this Court determine that the Commission's position cannot be sustained, § 211(c) would then require the amendment of the right-of-way acquisition agreement to reflect these costs under the terms of that section.

38. It would appear that an outdoor advertising structure would be particularly that type of structure or improvement susceptible to removal from the property by the tenant at the end of his term.

39. The Commission has contended that these structures are not compensible under § 302(b)(1) because they were not on the property pursuant to valid leases for a set term of years. This contention is without merit. Section 302(b)(1) does not require that structures on property acquired be present pursuant to a valid lease, but rather merely requires that such structures be present pursuant to some sort of landlord-tenant relationship between the original property owners and the owner of the structure. Regardless of the specific type of tenancy created by any of the agreements between plaintiffs and the original property owners with respect to plaintiffs' structures, plaintiffs had erected and were maintaining these structures with the consent of the original property owners, and were paying to the property owners a fee for this privilege.

It is undisputed that the Commission required plaintiffs' signboards to be removed from the property acquired for the sole reason that these structures were situated within the right-of-way for the Highway 54 project. Therefore, as the Commission purchased the underlying property, full compliance with § 302 would appear to require the Commission to purchase the signboards from plaintiffs and compensate plaintiffs under the formula stated in § 302(b)(1).

The § 305 assurances given by the Commission with respect to compliance with § 302 require the Commission to comply with the provisions of § 302 to the greatest extent practicable under Missouri law. The parties have agreed that on and after January 2, 1971 Missouri law did not prohibit the Commission from specifically complying with all provisions of § 302 on property acquired by negotiated purchase on federally assisted projects. Further, under § 226.-150 RSMo. (1969) the Commission had specific authority to comply with all provisions of § 302.[40] Hence, compliance with the provisions of § 302 "to the greatest extent practicable under State law" would appear in this case to be total compliance with that section.[41]

The Commission contends, however, that its assurances under § 305 do not require it to purchase plaintiffs' sign structures. This contention is predicated upon the Commission's assertion that all of plaintiffs' sign structures involved herein had been erected and/or were being maintained in violation of one or more provisions of the 1965 Missouri billboard control statutes (hereinafter, the 1965 Act) and as such it was not "practicable" under Missouri law for the Commission to purchase these structures and compensate plaintiffs as provided in § 302.[42] Therefore, the Commission asserts, it has complied with § 302 "to the greatest extent practicable" under Mis-

---

As such, plaintiffs were tenants within the meaning of § 302(b)(1).

It is worth note in this context that the real property acquisition provisions of the URA were designed to bring about uniform nationwide procedures for the taking of real property for federal or federally assisted projects. *Will-Tex Plastics Mfg., Inc. v. Dept. of HUD*, 346 F.Supp. 654 (E.D.Pa. 1972). Section 302 serves this purpose by eliminating distinctions in the laws of the various states concerning the definition of compensible real property interests with regard to buildings, structures, or improvements located on such real property. These distinctions are eliminated by the requirement that all buildings, structures or improvements located on real property acquired also be acquired, and that the owner of such building, structure or improvement be compensated whether he is the owner of the real property or a tenant thereon. Further, these structures must be acquired notwithstanding that such structures might be removable from the property by a tenant at the expiration of his tenancy, and for purposes of compensation must be considered to be part of the real property. Section 302 of the URA. See also House Report No. 91-1656 concerning this section, *U.S.Code Congressional and Administrative News*, 91st Congress, Second Session, at p. 5874.

40. See the discussion of § 226.150 *supra* at p. 1067.

41. It must be noted that § 302(b)(2) of the URA can not be asserted as a bar to acquisition of plaintiffs' signboards by the Commission. This section, for the stated purpose of preventing duplication of any payments made in acquiring property, requires that no payment shall be made to a tenant under § 302(b)(1) unless the owner of the land disclaims all interest in the building, structure, or improvement. No such disclaimers were ever made in this case, nor were such disclaimers sought by the Commission. However, the evidence is clear that no payment to any property owner included any sum for the value of plaintiffs' sign structures, either as these structures might enhance the value of the property or for their value for removal. Nor did the appraisals of the properties include any sums for the value of these structures. It is therefore apparent that if the Commission is directed to comply with § 302 with respect to these structures that no duplication of payments will have been made. Hence, the requirement of § 302(b)(2) that the property owners disclaim all interest in structures for which a tenant seeks compensation does not bar payment of compensation to the plaintiffs in this case.

42. The 1965 Act was codified as §§ 226.500 to 226.600 RSMo. (1969).

souri law notwithstanding its refusal to purchase plaintiffs' structures, and accordingly has not violated § 305 or its assurances thereunder as suggested by plaintiffs. For the reasons set forth below, the Court has concluded that this contention cannot be sustained.

The 1965 Act was passed in response to the enactment by Congress of the Highway Beautification Act, 23 U.S.C. § 131 et seq. The purpose of the 1965 Act was to regulate the use of billboard advertising adjacent to certain highways in the State, and to comply with the requirements of the Beautification Act. Substantially all of the 1965 Act was repealed, and new provisions enacted, on March 30, 1972 (the 1972 amendments).[43]

The Commission initially asserts that all of the signs involved in this case were violative of the 1965 Act in that plaintiffs had not acquired permits from the Commission for the erection and/or maintenance of these structures.[44] The Commission contends that eleven of the sign structures were violative of the 1965 Act only for this reason.[45]

The evidence establishes that prior to the time the Commission acquired the right-of-way over the parcels involved herein, plaintiffs had not applied for or acquired permits under the 1965 Act for any of their structures located on the acquired parcels. Plaintiffs were aware, generally, that the Commission considered billboards maintained without permits to be violative of the 1965 Act. Plaintiffs had not applied for permits because they believed the 1965 Act to be

invalid and unenforceable for various reasons, including both statutory and constitutional grounds. And, assuming the 1965 Act to be valid, plaintiffs questioned, *inter alia*, whether permits were required for valid pre-existing uses, and whether the Commission had ever promulgated and filed with the Missouri Secretary of State regulations for implementation of a permit system, as plaintiffs believed the 1965 Act required before the permit provisions became applicable. Although the Commission was aware of plaintiffs' position, no administrative or judicial proceedings were ever instituted to attempt to enforce the permit provisions with respect to plaintiffs' signs.

On June 1, 1970, Chief Counsel Hyder wrote to plaintiffs and advised them that for the Highway 54 project the Commission had acquired the properties upon which plaintiffs' signs involved herein were located. The letter then stated as follows:

"Please be advised that these billboards are unlawful, and you are directed to remove them immediately or the State Highway Commission will do so and recover the costs from your firm."

At the time this letter was sent, the Commission had not acquired any of the properties herein involved.

Plaintiffs responded by a letter from Glenn Whitman to Chief Counsel Hyder requesting the Commission to furnish proof of title, and advising that upon receipt of such proof plaintiffs would give the matter further consideration. At

---

43. On February 10, 1972 the Secretary of transportation determined that Missouri had failed to satisfactorily regulate billboard advertising as contemplated by the Highway Beautification Act and withheld ten percent of the funds appropriated to Missouri for federal aid projects in fiscal year 1973, and directed that Missouri comply with the Highway Beautification Act by March 31, 1972 or the withheld funds would be apportioned to other states. The 1972 Act was passed pursuant to an agreement between the State and the Department of Transpor-

tation to bring Missouri into compliance with the Highway Beautification Act. After the 1972 Act was enacted the withheld funds were restored to Missouri.

44. All of plaintiffs' structures involved herein were located within 660 feet of the right-of-way for Highway 54 before the improvement project, and as such fell within the provisions of the 1965 Act. See § 226.520 RSMo. (1969).

45. Signs No. 5, 6, 11, 12, 13, 22, 23, 27, 30, 47, and 49.

this time neither plaintiffs nor the Commission attempted to remove the signs.

Through a series of letters between counsel for plaintiffs and the Commission in the summer of 1971, after the Commission had acquired the right-of-way over the parcels involved herein, plaintiffs attempted to secure compensation for their sign structures which were required to be removed for the highway project.[46] In this correspondence the parties discussed the possibility of the Commission bringing an enforcement or declaratory judgment action in state court to determine the permit question, but no such action was ever filed.[47] On November 4, 1971 the plaintiffs submitted under protest applications and fees for permits for each of the structures involved in this case, but no permits were issued as Chief Counsel Hyder had directed employees of the Commission not to accept permit applications for existing signs after July 1, 1971.

The 1965 Act was in effect at all times pertinent to this case prior to the institution of this action. Under the express provisions of that act, unlawful advertising structures were defined, and the procedure for removal of such signs without compensation specified. Section 226.580 RSMo. (1969) provided as follows:

"Unlawful advertising shall be any sign, display, or device which violates the provisions of sections 226.500 to 226.600 (the 1965 Act). The state highway commission shall give thirty days' notice by certified mail to the owner of the sign, display, or device which is illegal, to remove same if illegal, or to cause it to conform to the provisions of sections 226.500 to 226.600 if it is an authorized sign, display or device. In the event the owner of the sign, display, or device involved fails to act within thirty days, as required in the notice, the state highway commission shall remove the sign, display, or device at the expense of the owner thereof."

Under the clear provisions of this section, Missouri law authorized removal of a sign structure without compensation only if the required notice was given and the sign owner failed to timely take the action specified in such notices.

The only notice sent to plaintiffs regarding the removal of their signboards was the June 1970 letter from Chief Counsel Hyder. This letter failed to satisfy the requirements of Section 226.580.[48] First, the letter was not mailed by certified mail as required by the statute. Second, and more importantly, the letter failed to advise plaintiffs of the basis for the asserted illegality of these signs, and did not advise plaintiffs that they could prevent the removal of their signs without compensation by causing them to conform to the provisions of the 1965 Act within thirty days, i. e., by acquiring permits.

Under these circumstances, it is clear that the Commission could not have removed plaintiffs' signboards without compensation for failure to acquire permits as the Commission had failed to comply with the notice requirements of § 226.580 prior to removal. Thus, the Commission cannot assert

---

46. In this correspondence plaintiffs requested to be advised of the reasons why the Commission considered plaintiffs' signs to be unlawful. The only reason ever provided was that no permits had been obtained.

47. The parties also discussed the possibility that amendments to the 1965 Act then pending in the legislature might moot the permit question and allow the Commission to compensate plaintiffs. These amendments were the eventual 1972 Amendments to the 1965 Act.

48. It must be noted that the provisions of the 1965 Act are penal in nature, as a violation of the Act is punishable as a misdemeanor for each day of violation § 226.600 RSMo. (1969). As such, Missouri law requires that the provisions of the Act be strictly construed against the Commission in all respects. Cf. *State ex rel. State Highway Commission of Missouri v. Carlton*, 453 S.W.2d 642 (Mo.App.1970).

plaintiffs' alleged failure to cause these structures to conform to the permit regulations of the 1965 Act as a basis for refusing compensation when such structures are required to be removed for highway construction purposes.

■ Furthermore, plaintiffs did submit permit applications for all sign structures involved herein in November of 1971. Permits were refused ostensibly because Chief Counsel Hyder had directed employees of the Commission to refuse permit applications for existing structures after July 1, 1971. But this determination of Chief Counsel Hyder cannot be considered to bind plaintiffs or restrict their rights in any way. Nothing contained in the 1965 Act authorized any cutoff date for the submission of permit applications. The Commission was authorized by the 1965 Act to promulgate rules and regulations for implementation and administration of a permit system. § 226.530 RSMo. (1969). But the authority to promulgate those rules was granted only to the Commission, not to its Chief Counsel. And even assuming that Chief Counsel Hyder did have authority to promulgate rules on behalf of the Commission, his decision to impose a cutoff date for permit applications was not filed with the Secretary of State of Missouri. Section 226.530 specifically provides that no rules or regulations for implementation or administration of a permit system shall be effective until thirty days after being filed with the Secretary of State.

Thus, the Commission could not validly refuse to issue permits upon plaintiffs' applications on the basis of Chief Counsel Hyder's direction. Cf. *Missouri Dental Board v. Riney, et al.*, 429 S.W.2d 803 (Mo.App.1968).[49]

The 1972 amendments to the 1965 Act were effective March 30, 1972, after the institution of this litigation but prior to the stipulation under which the signs were removed. Amended § 226.550 provides that signs existing prior to March 30, 1972 that were valid except for failure to have a permit shall not be considered unlawful signs, and the Commission was directed to issue permits for such structures within ninety days if application for permits was made. Plaintiffs timely submitted such applications. Thus, at the time the sign structures were removed, the Commission was prohibited by Missouri law from asserting the unlawfulness of plaintiffs' signs on the basis of plaintiffs' failure to acquire permits.

For these reasons, it is concluded that the Commission cannot assert the failure of plaintiffs to secure permits for the structures in question as a basis for declining to purchase the structures and compensate plaintiffs as provided by § 302 of the URA. As to all signs considered unlawful only because of the failure of plaintiffs to secure permits, it is therefore apparent that the Commission failed to comply with its assurances under § 305, as it was practicable under Missouri law to comply with § 302.[50]

---

49. The June 1970 notice did not serve to limit plaintiffs' time for application for permits to 30 days as for the reasons discussed it did not comply with the requirements of § 226.580.

50. Although no opinion is expressed with regard to the following, it is worth note in this context that it is not certain that the 1965 Act required permits of any sort for plaintiffs' sign structures involved in this case. The only sections of the 1965 Act relating to permits, §§ 226.530 and 226.550, do not state that permits are required as a condition to erection and maintenance of advertising, but merely that the Commission is

"authorized" to issue permits and collect fees for issuance of permits.

In the 1965 Junkyard Control Act, passed by the Missouri Legislature in the Second Extra Session of the 1965 legislative year, the same session in which the billboard act was passed, clearly and unequivocally required permits to be acquired before a junkyard regulated under the act could be operated. See § 226.670 RSMo. (1969). No such unequivocal language appears in the 1965 Act. Both the Junkyard Act and the 1965 Act were passed in response to the 1965 Federal Highway Beautification Act.

Further, most of plaintiffs' sign structures in this case qualified under the provisions of

In addition to the contention that plaintiffs failed to acquire permits, the Commission asserts that signs numbered 55, 14, 33, 34, 35, 37, 39, 43, 45, and 18 unlawful for other reasons. Each of these structures was originally erected prior to January 1, 1968. As such, it is conceded that these structures did not on the date of erection violate the provisions of the 1965 Act, which regulated erection and maintenance of billboards after January 1, 1968. Section 226.520 RSMo. (1969). The Commission contends, however, that these signs became unlawful subsequent to that date by being maintained in violation of the various lighting, size, or spacing requirements of the 1965 Act, and that therefore the Commission could not pay compensation for their removal.

This contention cannot be sustained. As with the alleged failure to acquire permits, violations of the lighting, size, or spacing requirements of the 1965 Act are subject to being remedied so as to bring any such structures into compliance with the 1965 Act. The only method under Missouri by which the Commission could have required removal of these signboards without compensation was under the provisions of § 226.580. As previously stated, this section requires that the Commission send a notice to the sign owner specifying that the sign structure is unlawful, and that unless defects are remedied within thirty days the Commission would remove the signs without compensation. No such notice was given by the Commission.

 Furthermore, under the 1965 Act the Commission could not require a structure to be removed for violation of the Act, if lawfully erected, until the end of the fifth year after it became in violation of the Act, or until July 1, 1970, if the sign structure was non conforming on August 4, 1966. § 226.560 RSMo. (1969).[51] In this case, there is no evidence to suggest that any of these signs failed to conform to the provisions of the 1965 Act as of August 4, 1966. And, no evidence was adduced with reference to any of these structures which would establish that the required five years had elapsed prior to the time the Commission attempted to require the removal of these signs without compensation. It therefore appears that the Commission was prohibited by Missouri law from requiring that any of the structures previously mentioned be removed without compensation at the time that such removal was attempted.[52]

Thus, for the foregoing reasons, the Commission cannot assert plaintiffs' alleged failure to comply with the provisions of the 1965 Act as a basis to deny compensation to plaintiffs for sign structures numbered 5, 6, 11, 12, 13, 14, 18, 22, 23, 27, 30, 33, 34, 35, 37, 39, 43, 45, 47, 49, and 55. As such, in failing to comply with § 302(a) and § 302(b)(1) of the URA with respect to these structures the Commission violated its assurances under § 305 of the URA.

§ 226.540 of the 1965 Act as sign structures in commercial or industrial areas pursuant to § 226.540(4). § 226.540 authorized outdoor advertising complying with that section "notwithstanding any other provisions of sections 226.500 to 226.600". Arguably, then, signs erected and maintained in compliance with the provisions of § 226.540 comply with the requirements of the 1965 Act notwithstanding those sections of the 1965 Act pertaining to permits.

51. § 226.560 provided: "Any outdoor advertising lawfully in existence along the interstate system or the primary system on August 4, 1966, and which is not in conformity with the provisions contained herein shall not be required to be removed until July 1, 1970. Any other outdoor advertising lawfully erected which does not conform to sections 226.500 to 226.600 shall not be required to be removed until the end of the fifth year after it becomes nonconforming."

52. It could be contended that sign number 55 violated the spacing requirements of the 1965 Act as of August 4, 1966. However, the evidence establishes that this sign group was erected prior to October 22, 1965 and lawfully in existence on that date. As such, the 1965 Act requires the Commission to compensate plaintiffs for this group if required to be removed for noncompliance with the Act. See § 226.570 RSMo. (1969).

The remaining sign structures are signs numbered 20, 25, and 38, which were originally erected after January 1, 1968, the effective date of the restrictions set forth in the 1965 Act. The Commission asserts that these structures were violative of the 1965 Act at the date of erection, and therefore the Commission need not compensate plaintiffs for the required removal of these structures. Plaintiffs contend that these structures did comply with the various provisions of the 1965 Act.

However, with regard to these three structures also the Commission failed to comply with the requirements of § 226.-580 RSMo. (1969). No notice specifying that these particular sign structures violated the provisions of the 1965 Act,

and advising plaintiffs that the Commission would require their removal without compensation unless these structures were brought into compliance with the 1965 Act within thirty days was sent to plaintiffs. Absent compliance with § 226.580, Missouri law does not authorize the Commission to require removal of nonconforming sign structures without compensation.

For the above-stated reasons, it is concluded that the Commission cannot assert the failure to plaintiffs to comply with the provisions of the 1965 Act as a basis for refusing compensation to plaintiffs for their outdoor advertising structures located on those parcels acquired after January 1, 1971.[53] With regard to the structures located on these

53. There is another reason why the Commission cannot be permitted to assert the failure of plaintiffs to comply with the 1965 Act as a basis for refusing compensation. Prior to March 30, 1972, the Commission took the position that § 226.590 RSMo (1969) prevented the Commission from using funds in the state road fund for administration, implementation, or enforcement of the 1965 Act. Subsequent to the enactment of the 1965 Act, no appropriations or other funds were made available to the Commission for administration, implementation or enforcement of the Act until March 30, 1972, the effective date of the 1972 amendments. Prior to that date, the Commission did not direct or authorize its counsel or any other employee to take any action to enforce any of the provisions of the 1965 Act, and in particular did not authorize or direct that any structure be removed for failure to comply with the 1965 Act.

The evidence establishes that the only time prior to the 1972 amendments that the Commission attempted to enforce the provisions of the 1965 Act relating to removal of "unlawful" signs occurred when the Commission determined that a property would be acquired for right-of-way purposes. When such a determination was made, the Commission would determine if any sign structures located thereon violated any of the provisions of the 1965 Act. If any structure was found to be violative, then, after the Commission acquired the property, the Commission would advise the owner of the structure, in a letter similar to the June, 1970 letter to plaintiffs, that the structure was "illegal" and direct its removal without compensation within thirty days.

It is undisputed that prior to March 30, 1972 the Commission never sought to remove any structure solely for violation of the 1965 Act. Rather, the structures that were required to be removed, such as those owned by plaintiffs herein were required to be removed only because they were situated within the highway right-of-way for a particular project. Alleged violations of the 1965 Act were then relied upon by the Commission to justify its refusal to compensate the owners of these structures, either under the 1965 Act, applicable federal statutes relating to acquisition of property on federally assisted projects, or under the Fifth and Fourteenth Amendments' protection against the taking of property without just compensation. For example, between 1965 and 1972 there were between 50,000 and 100,000 outdoor advertising structures in Missouri covered by the provisions of the 1965 Act. At most, less than 5,000 permits were ever issued. Nevertheless, the Commission never required the removal of a single sign structure for failure to acquire a permit or for failure to comply with other provisions of the 1965 Act unless the property was being or had been acquired for highway construction purposes.

The conclusion from the above is inescapable: the Commission enforced the restrictions contained in the 1965 Act only when it determined to acquire a particular property for highway purposes, and the alleged violations of the 1965 Act were then used as a method to require the removal of the structures from the property without compensation, thereby limiting the cost of acquisition to the State.

parcels compliance by the Commission with § 302 of the URA "to the greatest practicable under" Missouri law is total compliance with the provisions of that section. It is therefore apparent that the Commission failed to comply with its assurances under § 305 of the URA in failing to acquire the signboards in question under the provisions of § 302(a) of the URA and in failing to compensate plaintiffs therefor under the provisions of § 302(b)(1) of the URA.[54]

*Parcel No. 4*

As noted previously, the provisions of the URA do not apply to the structures (signs numbered 5 and 6) located on parcel no. 4, as that property was acquired by the Commission prior to January 1, 1971. *Will-Tex Plastics Mfg., Inc. v. Dept. of HUD,* 346 F.Supp. 654 (E.D.Pa.1972); *Rubin v. Dept. of HUD,* 347 F.Supp. 555 (E.D.Pa.1972). However, the URA preserved rights and liabilities under prior acts, and in this case

it appears that plaintiffs are entitled to relocation benefits for signs numbered 5 and 6 under the provisions of the Federal-Aid Highway Act of 1968.

The URA repealed numerous statutes superseded by the URA, including the Federal-Aid Highway Act of 1968, 23 U.S.C. §§ 501–511 (1968). URA § 220(a)(10, 11). Section 220(b) of the URA, however, provides that rights or liabilities under prior acts are not affected by the repeal. Further, § 221(c) of the URA provides that the repeals made by § 220(a) shall not be effective as to any State in which § 305 is not effective.

The Federal-Aid Highway Act of 1968, Public Law 90–495, 23 U.S.C. § 501–511 set forth a program of relocation assistance for persons displaced by federal or federal-aid highway programs. It was effective on August 23, 1968, as to all persons displaced on and after that date except that §§ 502, 505, 507, and 508 (23 U.S.C. §§ 502, 503, 505,

---

As a general rule, if a particular individual's loss due to enforcement of a police power regulation is of the same kind as that of the general public, then no taking has occurred in the constitutional sense and no just compensation need be paid. *United States v. Welch,* 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787 (1910); *R. J. Widen Co. v. United States,* 357 F.2d 988, 174 Ct.Cl. 1020 (1966); *Woodland Market Realty Co. v. City of Cleveland,* 426 F.2d 955 (6th Cir. 1970). But in this case the loss suffered by sign owners whose structures were located on property the Commission sought to acquire was not the loss suffered by the general public, or that suffered by sign owners in general, for the restrictions of the 1965 Act were only enforced against structures located on property the Commission sought to acquire for highway purposes. This arbitrary enforcement of the restrictions of the 1965 Act constitutes, as applied to the owners of sign structures on property the Commission sought to acquire, an attempt on the part of the Commission to implement a police power regulation as a substitute for the exercise of the power of eminent domain. Such action constitutes a taking of property without due process of law and without payment of just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitu-

tion. See *Robertson v. City of Salem,* 191 F.Supp. 604 (D.Or.1961). And cf. *Symonds v. Bucklin,* 197 F.Supp. 682 (D.Md. 1961). Thus, the Commission cannot assert the failure of plaintiffs to comply with the provisions of the 1965 Act as a basis for refusing to compensate plaintiffs for the sign structures required to be removed for the Highway 54 project.

54. No contention has been made that the 1965 Act, in and of itself, constitutes an unreasonable exercise of the police power, and no opinion is expressed in that regard. Further, as this Court has concluded that the Commission cannot assert plaintiffs' alleged failure to comply with the 1965 Act as a basis for refusing to compensate plaintiffs for the signboards in question, it is not necessary to consider plaintiffs' remaining contentions in this regard. Hence, no opinion is expressed as to (1) whether the procedures outlined in § 226.580 RSMo (1969) for the removal of signs without compensation satisfies due process, and (2) whether under Missouri law the amortization of prior valid uses is prohibited. Nor is it necessary to consider the effects of the 1972 amendments to § 226.570 and § 226.580. Similarly it is not necessary to consider the effect of the "Notwithstanding any other provisions of law" language of § 302(a) of the URA.

and 508) were not effective as to any State unable under its own laws to comply until July 1, 1970, when it became fully effective as to all states. See 23 U.S.C. § 502 note. It is therefore apparent that 23 U.S.C. §§ 501–511 were fully effective in Missouri on the date that parcel no. 4 was acquired by the Commission, in December of 1970.

23 U.S.C. § 502 provided that before the Secretary of Transportation may approve a federal-aid highway project he must receive satisfactory assurances from the State highway department that, among other things,

> "fair and reasonable relocation and other payments shall be afforded to displaced persons in accordance with sections 505, 506, and 507 of this title."

Such assurances were given by the Commission in letters to the Federal Highway Administration in September and October of 1968, before the federal-aid agreement for the right-of-way acquisition for the Highway 54 project was entered into on May 20, 1970.

Section 505(a) of Title 23, U.S.C. provided that

> "Upon application approved by the State agency, a person displaced by any highway project approved under section 106 or section 117 of this title may elect to receive actual reasonable expenses in moving himself, his family, his business, or his farm operation, including personal property."

As defined by 23 U.S.C. § 512, a "person" includes a partnership such as Osage Outdoor advertising at the time par-

cel no. 4 was acquired. 23 U.S.C. § 512(1)(A). A "displaced person" is defined as any person who moves from real property on or after the effective date of the act as the result of the property being acquired for a federal-aid highway project, or as the result of acquisition of property upon which a person conducts a business or farm operation. 23 U.S.C. § 512(3). The term "business" is defined as any lawful activity "for the sale of services to the public". 23 U.S.C. § 512(4)(B).

■ It is apparent that the plaintiffs, d/b/a Osage Outdoor Advertising were displaced persons within the meaning of 23 U.S.C. § 505(a) and 512 with respect to signboards numbered 5 and 6. Outdoor advertising falls within the definition of a "business" as outlined above. Outdoor advertising is certainly not unlawful in and of itself, and the only ground upon which the Commission asserts that signs 5 and 6 were being illegally maintained was the failure of the plaintiffs to secure permits under the 1965 billboard act. For the reasons stated previously, the Commission cannot assert failure of plaintiffs to acquire permits for these signs as a basis for refusing to compensate plaintiffs for the required removal of these signs. Further, these structures were subject to removal and relocation, and therefore under § 505(a) are considered personal property of the partnership that the Commission required to be moved from the real property.[55] Plaintiffs were conducting their business on parcel no. 4 by virtue of signs numbered 5 and 6 which the Commission required to be removed.

---

55. This is the essential difference between 23 U.S.C. § 505(a) and § 302 of the URA. The URA requires that "structures or improvements" be treated as real property whether or not they are subject to removal or relocation.

In this context it is worth note that should the owner of a building, structure, or improvement located on real property acquired for a federal or federal-aid project desire to obtain relocation assistance for such structure, as opposed to requiring the acquiring agency to purchase the structure under §

302 of the URA, he may do so. In pertinent part, § 302(b)(2) of the URA provides: "Nothing in this subsection shall be construed to deprive the tenant of any rights to reject payment under this subsection and to obtain payment for such property interests in accordance with applicable law, other than this subsection." Apparently, then, a tenant, should he desire to do so, may request payment under the relocation assistance provisions of the URA rather than under the real property acquisition sections.

Plaintiffs are therefore entitled to receive their actual reasonable expenses incurred in moving these structures from the real property, as provided by 23 U.S.C. § 505(a).[56]

### The Remedy

For the previously stated reasons, it is clear that the Commission failed to make payments under 23 U.S.C. § 505(a) to plaintiffs for the advertising structures required to be removed from parcel no. 4, as the Commission had assured the federal defendants it would do as a condition to approval of and receipt of federal funds for the Highway 54 right-of-way acquisition project. And, it is clear for the reasons previously stated that the Commission failed to comply with § 302 of the URA "to the greatest extent practicable under state law" as the Commission had assured the federal defendants it would do under § 305 of the URA, as to the sign structures located on parcels numbered 14, 38, 43, 44, 49, 51, and 52. In such circumstances where the required assurances have been given and the funds for the project paid out to the state agency, the proper remedy is to direct the state agency to comply with the provisions of the applicable federal statutes and its assurances thereunder. *Tullock v. State Highway Commission of Missouri,* 507 F.2d 712 (8th Cir. 1974); *La Raza Unida v. Volpe,* 337 F.2d 221 (N.D.Cal. 1971), *affirmed* 488 F.2d 559 (9th Cir. 1973), *cert. den.* 409 U.S. 890, 93 S.Ct. 150, 34 L.Ed.2d 147; *Lathan v. Volpe,*

455 F.2d 1111 (9th Cir. 1971); *Jones v. Dist. of Columbia R.D.A.,* 162 U.S.App. D.C. 366, 499 F.2d 502 (1974).[57]

Accordingly, pursuant to 23 U.S.C. § 505(a) the State Highway Commission of Missouri is declared to have the duty to pay plaintiffs reasonable relocation costs incurred for the moving of the outdoor advertising structures located on parcel no. 4. The Commission is further declared to have the duty to acquire from plaintiffs the sign structures located on the remaining parcels under the provisions of Section 302(a) of the URA, and under the terms of the mentioned stipulation the duty to compensate plaintiffs therefor under the provisions of Section 302(b)(1). Upon appropriate application the federal-aid project agreement for acquisition of the right-of-way for the Highway 54 project, under which all the property relevant to this litigation was acquired by the Commission, will be required to be amended pursuant to Section 211(c) to include the costs of compliance to the Commission.

In view of the parties' stipulation, and the situation thereby presented, it is therefore

Ordered that upon application of plaintiffs the State Highway Commission of Missouri pay to plaintiffs their actual reasonable expenses incurred in moving outdoor advertising structures numbered 5 and 6.

It is further ordered that the State Highway Commission of Missouri ac-

---

56. Plaintiffs' business on parcel no. 4 would not qualify for the optional payments provided by 23 U.S.C. § 505(c) as the business plaintiffs operated at this location was clearly part of a larger commercial enterprise having its principal place of business at Osage Beach, Missouri.

It is further worth note that normally administrative exhaustion is required before payments may be made under § 505(a), as the application for payment must be approved by the State agency. But where the State agency takes the firm position that no

benefits are payable to a party, as the Commission has done in this case, then further, futile administrative proceedings are not required. Cf. *Tullock v. State Highway Commission of Missouri,* 507 F.2d 712, 715 (8th Cir. 1974).

57. The Fifth Circuit has also implied that injunctive relief against the state agency is the proper remedy to correct violations of the URA. *Beaird-Poulan, Inc. v. Dept. of Highways of La.,* 497 F.2d 54 (5th Cir. 1974).

**1080**

quire an interest in plaintiffs' outdoor advertising structures numbered 11, 12, 13, 14, 18, 20, 22, 23, 25, 27, 30, 33, 34, 35, 37, 38, 39, 43, 45, 47, 49, and 55 equal to the interest acquired by the State Highway Commission of Missouri in the property upon which such structures were located.

It is further ordered that the State Highway Commission of Missouri compensate plaintiffs for the interest acquired by the Commission in plaintiffs' outdoor advertising structures numbered 11, 12, 13, 14, 18, 20, 22, 23, 25, 27, 30, 33, 34, 35, 37, 38, 39, 43, 45, 47, 49, and 55 in the amount by which each structure contributed to the fair market value of the property upon which it was located, or the fair market value of each structure for removal from the property, whichever is greater. For purposes of the determination of the amount of compensation to be paid, each outdoor advertising structure shall be deemed to be a part of the real property upon which it was located.

It is further ordered that upon appropriate application the May 20, 1970 Federal-Aid Project Agreement for Project No. F–54–3(23) be amended to include the costs of acquisition and compensation of the outdoor advertising structures numbered 11, 12, 13, 14, 18, 20, 22, 23, 25, 27, 30, 33, 34, 35, 37, 38, 39, 43, 45, 47, 49, and 55.

It is further ordered that plaintiffs' claims for compensation for whatever interest or rights they may have held in the property upon which their advertising structures were located are dismissed without prejudice.

It is further ordered, adjudged, and decreed that in all other respects the relief prayed for in plaintiffs' complaint be denied.

The costs of this action are taxed against the State Highway Commission of Missouri.

Judgment shall enter accordingly.